George MISKOVSKY, Appellant,

v.

**TULSA TRIBUNE COMPANY, a corporation, and Newspaper Printing Corporation, a corporation, Appellees.**

No. 55430.

Supreme Court of Oklahoma.

June 21, 1983.

Rehearing Denied Sept. 20, 1983.

Certiorari Denied Jan. 23, 1984.

See 104 S.Ct. 1000.

Carroll E. Gregg, Miskovsky, Sullivan, Miskovsky, Cooke & Gregg, Oklahoma City, for appellant.

James M. Sturdivant, John Henry Rule, Gable, Gotwals, Rubin, Fox, Johnson & Baker, Tulsa, for appellees.

LAVENDER, Justice.

For the purposes of this appeal, we need only consider the sufficiency of the allegations set forth in the amended petition to withstand a demurrer, the amended petition being identical to the original petition, except that the amended petition contains general allegations of special damages.

The amended petition alleges that defendants below are engaged in printing, publishing, and circulation of a newspaper known as The Tulsa Tribune of general circulation in Creek County, State of Oklahoma. Plaintiff below is a resident of Oklahoma City, a graduate of the University of Oklahoma, and a widely known practicing attorney since admitted to the Bar in 1936. He has a reputation of being a successful and responsible attorney and member of his profession. He has also been a successful businessman, active in civic and social affairs in the community and state, and at all times herein referred to, he was a duly qualified and filed candidate for the office of United States Senator.

The amended petition alleges the publication by defendant of nine separate items in the newspaper, alleged to be libelous, six of which are writings, and three cartoons, all relating generally to the then political campaign for the office of United States Senator. We will first consider the allegations pertaining to the writings.

1. The first is an editorial appearing in the newspaper on August 11, 1978, headlined, "The Unqualified Candidate." A fair and objective reading of the publication discloses that it states that plaintiff, who received less than two percent of the vote in his last statewide campaign, desperately needed a political issue to put life into his hopeless campaign, asked Governor Boren, the acknowledged frontrunner in the senate race whether Boren is a homosexual or bisexual, and characterizing the query as a cruel variation of the proverbial lawyer's question, "Have you stopped beating your wife?", and an irresponsible smear. The article further states that the query was made without evidence of the other candidate's sexual abnormality, but was premised upon a campaign statement by a third candidate who, without any supporting evidence, stated that Boren is a homosexual. The editorial concludes by stating that the voters should not be swayed by plaintiff's descent to sewer politics, and strongly suggests that plaintiff is unqualified to be senator.

2. On the 17th day of August, 1978, an article purportedly written by one E.N. Earley entitled, "Sometimes the press a shade hypocritical," appeared in the newspaper. The article states:

> "Sometimes we members of Oklahoma's fourth estate are a bit too pious.

"Such is the case with the George Miskovsky-Gov. Boren dispute.

"When trailing Senate candidate Miskovsky asked Boren to answer questions about his sexual habits, editorial writers were enraged.

"They called Miskovsky 'A Voice From the Sewer.'

"Miskovsky's remarks were a cheap publicity stunt. But the editorial writers' surprise and shock reeks of hyprocrisy."

The article further states Boren's sexual preferences were a subject of gossip among the members of the press, that Boren was aware of the gossip, but was advised that a public denial would only give credence to the rumors.

"But when Miskovsky brought up the subject, the press was flabbergasted.

"There is little doubt that Miskovsky's voice came from a sewer, but it is a sewer that was constructed—in part—by the press."

3. On the 24th day of August, 1978, an article purportedly written by one Will Sentell entitled, "Boren reverses tactics * * * Governor swears he disapproves of homosexuality," appeared in the newspaper. A fair import of the article is a speculation upon the outcome of the forthcoming election engendered by Governor Boren's public denial under oath that he has ever been a homosexual or bisexual and that he approves or condones such activities.

The article further states: " 'Boren got the message from the voters,' Miskovsky said. 'His delayed answer under oath to the questions I asked puts the issue to rest as far as I'm concerned.' "

4. On the 25th day of August, 1978, an editorial appeared in the newspaper headed "Boren's overkill." It states:

"The spectacle of Oklahoma's Governor David Boren calling a press conference to swear on the Bible that he was not a homosexual not only marked some kind of a first in American political history, but it was utterly unnecessary.

"The sensational innuendo advanced by George Miskovsky in a desperate effort to gain attention for his senate campaign had already exploded in Miskovsky's face. His miniscule vote was proof enough.

"The governor pleaded not guilty in the face of no evidence to the contrary. Surely, he has a soft, baby face. But so did Audie Murphy, the most decorated U.S. hero of World War II. The governor opened himself to an immediate lampoon by his runoff opponent, Ed Edmondson, who publicly swore he was not and never intended to be a Republican.

"Instead of swearing, the Governor should have simply shrugged."

5. On the 11th day of August, 1978, an article purportedly written by one Richard Tapscott appeared entitled, "Foe says Boren 'overreacted' Miskovsky questions sexual conduct." The article quoted plaintiff as saying Governor Boren and the editorial writers "overreacted" to his bringing to the public the charges made by the third candidate regarding Boren's alleged sexual preferences and conduct. "They acted emotionally as if I had made the charge. I heard the rumor, as have many others, for months. When it came to a head in a public forum, I felt I should report it to the media and give the governor an opportunity to respond." It related that plaintiff said he had received many calls, but none that says he should not have called it to the attention of the media. A spokesman for the Boren campaign was quoted as saying, "People seem to be outraged by it." Plaintiff was further quoted as saying, "I have seen these rotten, dirty, scurrilous, below-the-belt editorials before." The article speculated upon the effect of the "issue" upon the political campaign, then quoted from an anonymous "political analyst" that, "The Anthony Points thing was nothing. Miskovsky made a tremendous blunder."

6. On the 12th day of August, 1978, there appeared in the newspaper a news analysis purportedly written by one Will

Sentell. In the article, the statement is made:

"When longshot contenders Anthony Points and George Miskovsky quizzed Boren on his sexual life, specifically whether he is a homosexual or bisexual, without offering any evidence, a muddy race got a lot muddier.

"Besides the fact Boren categorically denied the allegation, which was roundly trounced on by the state press, supporters are trying to gage what, if any, impact to expect.

"Most of the early indicators are pointing toward more good than harm going to the governor.

"A charge like the one lodged, the theory goes, will wind up bringing down fence sitters who might have otherwise stayed out of the race, or at least out of Boren and his Broom Brigade camp."

The balance of the article, insofar as pertinent, speculates upon the effect of the "issue" thus raised will have upon the election results.

7. On August 11, 1978, defendant published a cartoon, a reproduction of which is as follows:

8. On August 15, 1978, the defendants published a cartoon, a reproduction of which is as follows:

9. On August 25, 1978, defendants published a cartoon depicting in cariacture an effigy of President Carter saying, "Ah've lusted after women in muh heart—" and an effigy of Governor Boren saying, "Me too! Me too!" with no reference to the plaintiff being contained within the cartoon.

■ In the case of *Miskovsky v. Oklahoma Pub. Co.*, Okl., 654 P.2d 587 (1982), this Court considered in detail the burden plaintiff must meet as a public figure in order to maintain an action in libel generally. The plaintiff must show:

(1) The publication of a defamatory statement;

(2) That the defamatory statement was false;

(3) That the defamatory falsehood was made with "actual malice"—made with knowledge that it was false, or with reckless disregard of whether it was false or not;

(4) The "actual malice" must be shown with "convincing clarity";

(5) The state of mind required for actual malice would have to be brought home to the person in the publishing organization having responsibility for the publication of the alleged libelous publication;

(6) To be made with "reckless disregard," there must be a showing that the publisher in fact entertained seri-

ous doubt as to the truth of the publication.

In *Fite v. Oklahoma Pub. Co.*, 146 Okl. 150, 293 P. 1073 (1930), we held that words charged to be defamatory and therefore libelous fall into three classes:

(1) Those not of defamatory meaning;

(2) Those reasonably susceptible of both a defamatory and an innocent meaning (commonly referred to as libel per quod); and

(3) Those clearly defamatory on their face (commonly referred to as libel per se). (In accord, see *Akins v. Altus Newspapers, Inc.*, Okl., 609 P.2d 1263 (1977), cert. den. [449 U.S. 1010], 101 S.Ct. 564 [66 L.Ed.2d 467].)

And, in *Winters v. Morgan*, Okl., 576 P.2d 1152 (1978), we held that in testing the sufficiency of the petition to withstand a demurrer, the entire writing must be examined by the Court to determine as a matter of law whether or not the article is libelous per se, observing: "Language out of context may have a different meaning than the same language within the four corners of the (publication)."

In *Fite v. Oklahoma Pub. Co., supra,* we said: "The true rule is that, where the publication alleged to be defamatory charges the plaintiff with nothing he might not have legally and properly done, the same cannot be held to be libelous per se." *Fite* further held that a judicial review of whether the publication is libelous per se turns on whether the statements made in the publication, when construed by the most natural and obvious meaning and in the sense that they would be understood by those to whom they were addressed, charged the plaintiff with anything that the plaintiff might not have legally and properly done.

Tested by the foregoing principles, a careful review of the publications both separately and together clearly shows that none of them, nor do all of them collective-

ly, state a cause of action for libel per se. None of the publications charge the plaintiff with a commission of a crime or with anything that the plaintiff might not have legally and properly done. The factual data therein set forth as *facts* are true as is alleged in the allegations in plaintiff's petition. When viewed even in their most derogatory sense as related to the plaintiff, while possibly unflattering or even reprehensively false *in their conclusions,* they are expressions of opinion, privileged under the First Amendment to the United States Constitution. Nor do the publications expose the plaintiff to public hatred, contempt, ridicule or obloquy, or tend to deprive him of public confidence, or injure him in his occupation within the meaning of 12 O.S.1981, § 1441. *Thompson v. Newspaper Printing Corporation,* Okl., 325 P.2d 945 (1958). In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1947), the United States Supreme Court said:

"Under the First Amendment there is not such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."

We next turn to the question of whether the publications are *or may be* libelous per quod. In *Akins v. Altus Newspapers, Inc., supra,* this Court held (1267): "It is a matter of law for the court to determine if the publication was libelous per se, as opposed to a fact determination for the jury as to the publication being libelous per quod." We approach this issue from two aspects: (1) The requirements for a petition for libel per quod to withstand a demurrer with reference to special damages, and (2) the requirements for a petition for libel per quod to withstand a demurrer with reference to innuendo, that is, the explanation of words that are of doubtful or ambiguous meaning, and to attach to them their proper meaning.

## I.

As to the first aspect, in *Fite v. Oklahoma Pub. Co., supra,* this Court quoted with approval the holding in *McKenny v. Carpenter,* 42 Okl. 410, 141 P. 779 (780) (1914) wherein it is stated: "... where the article itself is not libelous per se, there must be an allegation of special damages, before a recovery can be had.... It is insufficient to allege generally that the plaintiff 'was and is greatly and permanently injured and damaged in his good name and reputation and was and is exposed to public contempt, hatred, and ridicule and has been caused to resign his position with the said city of Ardmore and has been damaged in his business and reputation in the amount of $10,000' without showing by proper averment how the special damages were occasioned." (Citations omitted.)

Plaintiff contends that the amended petition conforms to the requirements set forth in 12 O.S.Supp.1980, § 1444, and having done so, that is all he is required to do. However, we find no conflict between the requirements enunciated in *Fite, supra,* and § 1444.[1] While the amended petition does make general allegations of special damages alleged to have been sustained by the plaintiff, it is demurrably deficient in its failure to aver how the special damages were occasioned. *Haynes v. Alverno Heights Hospital,* Okl., 515 P.2d 568 (1973).

We next consider the requirements for a petition for libel per quod to withstand a demurrer with reference to innuendo.

The leading case in Oklahoma is *Kee v. Armstrong, Byrd & Co.,* 75 Okl. 84, 182 P. 494 (1919). In addressing the subject of libel per quod, the Court said (498):

"If the publication is libelous, it must come within that class of cases as being reasonably susceptible of a defamatory as well as an innocent meaning, and those publications that are termed and designated as not libelous per se. In order for the petition to state a cause of action, it is necessary for the plaintiff to plead by way of inducement or averment, colloquium and innuendo, certain extrinsic facts which connect the plaintiff with the libelous publication and to plead the meaning the words have and that they would be understood to have in connection with the libelous article as published."

The Court further quoted with approval from the case of *Penry v. Dozier,* 161 Ala. 292, 49 So. 909 in part as follows:

"An 'innuendo' is only explanatory of the subject-matter ... and is and can be explanatory only of such matter. It cannot extend the sense of the words beyond their own meaning unless something is put upon the record for it to explain (citations omitted). An innuendo cannot make a thing certain which is, in fact, uncertain. An innuendo cannot enlarge or restrict the natural meaning of words, nor can it introduce new matter. An innuendo cannot be proved, and it is for the court to decide whether given words or given publications are capable

---

1. 12 O.S.1971, § 1444 provided: "In all civil actions to recover damages for libel or slander, it shall be sufficient to state generally what the defamatory matter was, and that it was published or spoken of the plaintiff, and to allege any general or special damage caused thereby, *and the plaintiff to recover shall only be held to prove that the matter was published or spoken by the defendant concerning the plaintiff.* As a defense thereto the defendant may deny and offer evidence to disprove the charges made, or he may prove that the matter charged as defamatory was true, and in addition thereto, that it was published or spoken under such circumstances as to render it a privileged communication." (Emphasis added.)

The emphasized portion of the statute was declared unconstitutional in *Martin v. Griffin Television, Inc.,* Okl., 549 P.2d 85 (1976) pursuant to a determination that legislative creation of presumed malice by the State of Oklahoma is unconstitutional. The Legislature repealed 12 O.S.1971, § 1444 by Laws 1080, c. 68 § 1, emerg. eff. April 10, 1980, and reinacted the section as § 1444.1, deleting only that portion declared unconstitutional, by Laws 1981, c. 21, § 2, operative April 7, 1981.

of the meaning ascribed to them by the innuendo, and for the jury to decide whether such meaning is truly ascribed to them. (Citations omitted.) Where words claimed to be defamatory are capable of conveying an innocent meaning, then there must be an averment and an innuendo showing not only that the words are intended by plaintiff in a defamatory sense, but that the hearers may have understood the language as conveying the allege defamatory meaning. (Citation omitted.)"

And again (182 P. at p. 500) citing many authorities in support:

"... an innuendo cannot be used to enlarge the meaning of words, nor attribute to them a meaning which they would not bear."

In *Oklahoma Pub. Co. v. Kendall*, 96 Okl. 194, 221 P. 762 (1923) it is held that the mere allegation in the petition that a publication alleged to be libel per quod that the publication was intended to charge plaintiff with a specific crime is not sufficient, and being mere gratuitous conclusion of the pleader, cannot give the words a meaning which they do not otherwise have. In accord, see *Phoenix Printing Co. v. Robertson*, 80 Okl. 191, 195 P. 487 (1921).

In view of the foregoing authorities, we hold that the amended petition in the case before us is fatally deficient in allegations of innuendo sufficient to withstand a demurrer to the petition.

But there remains for our consideration the question of whether the petition *may by amendment* state a cause of action for libel per quod. The trial court held and determined that the petition could not be amended to state a cause of action, thus dismissing said cause with prejudice in the trial court's ruling sustaining the demurrer to the petition. Plaintiff challenges the ruling of the trial court.

Title 12 O.S.1981, § 318 provides: "If the demurrer be sustained, the adverse party may amend, if the defect can be remedied by way of amendment, with or without costs, as the court, in its discretion, shall direct."

In *Tipton v. Standard Installment Finance Company*, Okl., 418 P.2d 309 (1966), this Court, in construing said statute said:

"As will be noted from a reading of said statute, the allowance of such amendments is therein placed within the discretion of the court, and is not thereby made a matter of right."

In the case before us, no issue is raised as to the timeliness of a request to amend the amended petition as was present in *Tipton, supra.* Here, the trial court sustained defendants' demurrer to the petition and simultaneously determined that the deficiencies in the petitioin could not be cured by amendment. If the ruling of the trial court was reversible error in that the deficiencies might reasonably have been cured by amendment, then this Court should upon reversal accord the plaintiff an opportunity to amend within a reasonable time.

When tested by the foregoing authorities pertaining to the necessary allegations of a petition to state a cause of action for libel per quod, we hold that all of the publications before us, including the cartoon which appeared in the newspaper on August 11, 1978, are clear and unequivocal in their meaning and import and therefore immutable to innuendo.

## II.

█ The cartoon published on August 11, 1978, plaintiff urges, may become actionable as libel per quod by amendment to the petition. While the amended petition contains no allegations of innuendo pertaining to that publication, plaintiff *argues* in his brief: "The scurrilous effigy clearly shows a character that looks like the Appellant sucking upon a sewer pipe; and, coincidentally the end of that sewer pipe that he is sucking on just happens to have the appearance of a male penis." Thus, plain-

tiff reasons, in effect, the publication by innuendo is capable of charging him with the crime of sodomy.

The rules by which a pictorial cartoon's amenability to innuendo to explain its meaning and import are the same as in the case of writings. While, as we have heretofore pointed out, innuendo may be explanatory of the meaning of the publication alleged to be libelous, whether pictorial or writings, and of the understanding imparted to the ordinary viewer of the publication, innuendo cannot be used to enlarge that meaning or to attribute to it a meaning which it will not bear. An objective examination of the cartoon published on August 11, 1978, neither by its unembellished presentation nor by the addition of any possible innuendo imparts to the plaintiff the commission of the crime of sodomy, and when viewed in its most derogatory sense, does no more than express the writer's opinion of the political tactics of plaintiff's political campaign.

The ruling of the trial court sustaining demurrers to the original and amended petition and determining that the petition's defects are not amendable is affirmed.

BARNES, C.J., and IRWIN, HODGES and HARGRAVE, JJ., concur.

SIMMS, V.C.J., concurs in result.

WILSON, J., concurs in part and dissents in part.

DOOLIN, J., dissents.

OPALA, J., certified his disqualification.