PROFESSIONAL ASSET
MANAGEMENT, INC.,
Plaintiff,

v.

PENN SQUARE BANK, N.A., et
al., Defendants.

Nos. Civ–82–1357–W, Civ–83–69–W, Civ–83–1583–W, Civ–83–3117–W, Civ–84–1596–W, Civ–84–1663–W, Civ–84–1671–W, Civ–84–1672–W and Civ–84–1678–W.

United States District Court,
W.D. Oklahoma.

April 30, 1985.

---

Stanley W. Levy, Ross Arbiter, Lyle R. Mink and K. Phillip Knierim, Barbara Brown, Mark S. Simonian, Gordon, Weinberg, Zipser, Erwin E. Adler, Patricia A. Beaman, Rogers & Wells, Carol B. Sherman, Allan E. Ceran, Los Angeles, Cal., Jones, Givens, Gotcher, Doyle, & Bogan, Inc., Tulsa, Okl., Gene A. Castleberry, Robert Wiener, Law Offices of Gene A. Castleberry, Jack G. Bush, Gary R. Underwood, Oklahoma City, Okl., for plaintiff.

Stephen P. Friot, Spradling, Alpern, Friot & Gum, Oklahoma City, Okl., John W. Vardaman, Jr. and David D. Aufhauser, John K. Villa, Gerson A. Zweifach, Williams & Connolly, Washington, D.C., Peter B. Bradford, Bradford, Haswell, Jones, Philip F. Horning, Horning, Johnson & Grove, Jack G. Bush, Gary R. Underwood, Murray E. Abowitz, Abowitz & Welch, Robert C. Margo, George F. Short, S. Thomas Adler, Short Barnes Wiggins Margo Adler & Worten, Oklahoma City, Okl., Richard E. Comfort, Claire E. Barrett, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Okl., John C. Snodgrass and David T. Hedges, Jr., Vinson & Elkins, Houston, Tex., James E. Work, Shirk, Work, Robinson & Williams, J. William Conger and James C. Prince, Larry D. Hartzog, Hartzog, Conger & Cason, Earl D. Mills, John M. Perry III, Mills, Whitten, Mills & Mills, Charles C. Green, Turner, Turner, Green & Braun, Oklahoma City, Okl., Richard B. Talley, Talley, Perrine & Smith, Norman, Okl., James W. Bill Berry, James W. Bill Berry & Associates, Harold M. Durall, Reid E. Robison, John N. Hermes, McAfee & Taft, Stephen D. Powell, Kirk & Chaney, John N. Goodman, Burck Bailey, Warren F. Bickford IV, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., Charles C. Baker, Oliver S. Howard, Gable & Gotwals, Tulsa, Okl., Andrew B. Weissman, Wilmer, Cutler & Pickering, Washington, D.C., K. Phillip Knierim, Mark S. Simonian, Wood, Lucksinger & Epstein, Los Angeles, Cal., for defendants.

## ORDER

LEE R. WEST, District Judge.

Presently before the Court is PAM's motion to dismiss Peat, Marwick's counterclaims for libel. Peat's counterclaims were asserted in its answer to PAM's third party complaint in *Jax Navy Federal Credit Union v. Penn Square Bank, et al.*, CIV–83–1583–W, as well as in its answer to PAM's Second Amended Complaint in *PAM v. Penn Square Bank, et al.*, CIV–82–1357–W. These cases have been consolidated with several others, as captioned above. Inasmuch as the counterclaims involve the same facts, allegations, and parties, they will be considered jointly.

The allegedly libelous publication is a letter dated July 28, 1982, written by PAM's principals to their investor clients describing PAM's knowledge, or more precisely PAM's lack of knowledge, about the events leading up to the declared insolvency of Penn Square Bank. The letter can be described generally as professing PAM's surprise and lack of warning as to Penn Square's financial condition. The letter refers to certain statements contained in Peat's December 31, 1981, audit report of Penn Square.

Peat alleges that the PAM letter was libelous in its implications and omissions concerning the audit report. PAM maintains that Peat's claims fail to state a cause of action for libel.

Oklahoma law defines libel as

"a false or malicious unprivileged publication by writing, printing, picture, or effigy, or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule, or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as aforesaid ..."

Okla.Stat.Annot., Tit. 12 § 1441 (West 1980).

PAM's July 28th letter contains the following statements:

To The[1] Clients of Professional Asset Management, Inc.:

\* \* \* \* \* \*

What was the public told about the condition of the Bank? Once again, the

answer is simple: the public was told the Bank was in good condition (sic). Peat, Marwick, Mitchell & Co., one of the big eight accounting firms, issued its report dated March 19, 1982, on the consolidated financial statements of the Bank which reflected that at December 31, 1981, the Bank had $485,000,000 in assets, up from $328,000,000 at December 31, 1980; total stockholders equity of $31,500,000, up from $20,400,000; cash, time deposits, and due from other banks $87,400,000, up from $59,600,000; net investment securities of $47,400,000, up from $42,300,000; and, after allowances for possible loan losses, net loans of $271,000,000, up from $199,800,000.

The Bank reported that at December 31, 1980, it had sold to other banks $2,800,000 in loans under agreements to repurchase. In the Bank's financials for the period ending December 31, 1981, to which Peat, Marwick, Mitchell & Co. gave its opinion, however, the Bank reported that it had no loans sold under agreements to repurchase....

Two of the items on the Bank's financials, in retrospect, turned out to be two of the most important items of all. These were the statements about allowances for possible loan losses and about contingent liabilities. According to Peat, Marwick, Mitchell & Co., the accounting firm of Arthur Young & Co., the Bank's former auditors, had qualified their opinion on the Bank's financials for the period of December 31, 1980, because Arthur Young & Co. was "unable to satisfy themselves as to the adequacy of the allowance for possible loan losses due to the lack of supporting documentation of collateral values of certain loans." Peat, Marwick, Mitchell & Co. did *not* qualify its opinion on the Bank's financial statements for the period of December 31, 1981; it stated that the "financial statements present fairly the consolidated financial position of Penn Square Bank, N.A., and its subsidiary at December 31, 1981, and the results of their operations and the changes in their financial position for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year."

\* \* \* \* \* \*

The large financial institutions—Continental Illinois, Seattle-First, Michigan National, and Northern Trust, ... did not know of the problems at Penn Square. The various credit unions did not know of the problems at Penn Square Bank. We can only assume that these large financial institutions were relying on the same information that we relied on, including the Peat, Marwick, Mitchell & Co. opinion and the Bank's financial's of December 31, 1981, the Bank's own statements of condition, and the historical policy of the FDIC and the Comptroller.... People who deposited money in Penn Square Bank—and large financial institutions with research and analytical staffs many times larger than ours—were deceived....

In its counterclaim, Peat alleges that the PAM letter ... is false and defamatory as to Peat, Marwick in that it was intended to mean and was understood by the clients of PAM to whom the PAM letter was sent as stating that Peat, Marwick had reported that Penn Square's condition was "good"; that no information had been set forth in the report and statements concerning the subject of allowances for possible loan losses (one of the two items described by the PAM letter as the "most important items of all") except as set forth in the PAM letter; that Peat, Marwick, rather than Penn Square management, was responsible for allowances for possible loan losses; that such conduct of Peat, Marwick was improper and incompetent judged by the standards of the accounting profession; and that Peat, Marwick was responsible for the plight of those of PAM's clients which had made uninsured deposits in Penn Square ... In publishing statements intended to, and in fact, conveying such false and defamatory meaning, impression and implication, PAM and each of the individual counter-

claim defendants acted with actual malice, that is each knew the meaning, impression and implication so conveyed to be false or acted with reckless disregard of such falsity. . . .

The unprivileged publication of the PAM letter has exposed Peat, Marwick, and its partners and principals, to public hatred, contempt, ridicule and obloquy, thereby causing injury to them in their occupation and profession, tending to diminish public confidence in them and has impugned their reputation, credibility, integrity and professional competence . . . The PAM letter is libelous *per se*, on its face, as to Peat, Marwick . . . (Answer and Counterclaim of Peat, Marwick, Mitchell & Co., CIV-82-1357-W January 25, 1983, ¶¶ 116-117 at 19-20.) (emphasis in original).

■ Under Oklahoma law, libel *per se* requires words which alone and of themselves, without anything more, are opprobrious. In other words, a publication is actionable *per se* "when the language used therein is susceptible of but one meaning, and that an opprobrious one, and the publication on its face shows that the derogatory statements, taken as a whole, refer to the plaintiff, and not to some other person." *Fite v. Oklahoma Publishing Co.*, 146 Okl. 150, 293 P. 1073 (1930).

Sanctioning *Fite's* continued vitality, the Oklahoma Supreme Court has determined that for a publication to constitute libel regarding employment, "it must prejudice the employee by impeaching his skill or knowledge or by attacking his conduct in his business." *Haynes v. Alverno Heights Hospital*, 515 P.2d 568, 569 (Okla.1973). Both reason and case law support the extension of this principle to allegedly libelous statements concerning professional competence, as here involved.

■ The words of PAM's letter do not, on their face, convey or contain hatred, contempt, ridicule, or obloquy as judged by their natural and obvious meaning. *Tulsa Tribune Co. v. Kight*, 174 Okl. 359, 50 P.2d 350 (1935). This Court determines as a matter of law that the letter cannot be said

to be libelous *per se*, *Akins v. Altus Newspapers, Inc.*, 609 P.2d 1263 (Okla.1977), *cert. denied* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980).

■ A publication which is not libelous *per se* may nonetheless be actionable as libel per quod if the petition sufficiently pleads special damages and innuendo (i.e., the explanation of extrinsic facts, and their connection to the plaintiff through the words charged, resulting in an understood meaning). *Miskovsky v. Tulsa Tribune Co.*, 678 P.2d 242, 247 (Okla.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). If a writing is not libelous *per se*, "the court has the further duty to determine as a matter of law whether the writing is susceptible of a defamatory meaning derivable from extrinsic facts and circumstances which must be specifically pleaded and supported by proof of special damages, i.e., libelous *per quod*", *M.F. Patterson Dental Supply Company v. Wadley*, 401 F.2d 167 (10th Cir.1968).

■ Concerning the requisites of libel *per quod*, the innuendo pleaded must establish "such extrinsic facts as will show that (the words) were intended to be slanderous and were so understood. These averments must be distinctly stated in the inducement and apply to the plaintiff by a proper colloquium with the intended and understood meaning set out in the innuendos." *Oklahoma Publishing Co. v. Gray*, 138 Okl. 71, 280 P. 419 at 423 (1929); *Phoenix Printing Co. v. Robertson*, 80 Okl. 191, 195 P. 487 (1921). Libelous innuendo is not sufficiently established by a conclusory allegation that libel was intended; the Court must first determine "whether the words used are susceptible of the meaning sought to be given to them by the innuendo . . . *If it be decided by the court that the words are* susceptible of the meaning the innuendo seeks to ascribe to them, *then* it becomes a question for the jury to determine, under all the circumstances, whether they were intended to mean what the innuendo avers they did." *Phoenix Printing Co.*, 195 P. at 489 (emphasis supplied). If the

court determines that the words as published do not establish a sufficient predicate for the meaning ascribed to them through innuendo, then the case should not reach the jury whose province it is to determine only whether the innuendo, or implication, in fact was drawn from the published words. *Miskovsky*, 678 P.2d at 248–249.

■ In reviewing the published words in relation to the extrinsic facts and circumstances and the person charging libel, the Court must bear in mind that it cannot through innuendo enlarge the plain meaning of words or attribute to them a meaning they do not have. *Miskovsky*, 678 P.2d at 249, 250; *Kee v. Armstrong, Byrd & Co.*, 75 Okl. 84, 182 P. 494 (1919). Moreover, when the meaning of a publication is sufficiently clear on its face, innuendo cannot imbue an otherwise nonlibelous statement with the taint of defamation. *Miskovsky*, 678 P.2d at 249–250. Neither fear nor conjecture render libelous what is otherwise vague or remote.

The inducement, or factual context, at bar is that Peat conducted an audit of Penn Square Bank; that the Bank subsequently was declared insolvent; and that PAM made certain statements in its letter which, broadly construed, professed surprise and lack of warning through Peat's audit or any other source. The colloquium, or nexus, is that Peat was named in PAM's letter as having performed the December 31st audit. The innuendo urged by Peat is that the letter in both its intent and effect cast aspersions on Peat's competence and assigned to Peat responsibility for Penn Square's financial demise. This proposition and indeed the entire issue of Peat's liability *vel non* is the subject of much litigation in the cases at bar and elsewhere. The terms of the letter, however, neither suggest culpability nor identify a culprit in Peat or anyone else; they merely suggest astonishment. Whether or not Peat had a duty to PAM and whether that duty was breached is neither addressed in the letter nor yet established through litigation.

■ In pleading special damages it is insufficient to allege generally, as Peat has done, that published material referring to plaintiff's profession and business "exposed him to public hatred, contempt ridicule, scorn, and obloquy, thereby and with the intent of depriving him of public confidence and injuring him in his profession and business." *Edwards v. Crane*, 292 P.2d 1034, 135–136 (Okla.1956); *Oklahoma Publishing Co. v. Gray*, 138 Okl. 71, 280 P. 419 (1929). Such allegations are insufficient because they are merely conclusory without foundation or explanation as to how the damages were occasioned or whether that they occurred as a natural and proximate result of the publication. *Haynes*, 515 P.2d at 570. An allegation of special damages is deficient if it fails to aver how the damages were occasioned. *Miskovsky*, 678 P.2d at 248; *Oklahoma Publishing Co. v. Gray*, 280 P. at 423.

The only specific allegation offered by PAM in support of its claim to special damages is that "the PAM letter was expressly addressed and published to PAM's clients which ... include 'credit unions, savings and loan associations, other banks, pension funds, government agencies, corporations, and wealthy individuals'—i.e., precisely the members of the business community from which Peat, Marwick draws its own clients." (Answer and Counterclaim of Peat, Marwick ¶ 117 at 20.) That such potential customers were addressed by the PAM letter goes to the issue of publication, but it does not establish sufficient causation to meet the criteria of *Fite, Gray, Haynes*, and *Miskovsky*. Peat alleges that its "injuries have been, and are likely to be ... particularly acute" as a result of the letter's publication to Peat's potential clients (Counterclaim ¶ 117 at 20), but nowhere does the counterclaim allege that specific accounts were terminated or precluded by the letter, nor does it aver any concrete impairment of its business as a direct result of the letter. Far from the realm of concrete injury, Peat's basis is merely its apprehension of harm.

The Court notes also that Peat does not deny making the statements quoted by PAM and does not contest the accuracy of

the attributions. It argues instead that the statements and attributions were incomplete insofar as they did not present Peat's report in its entirety and its explanation of Penn Square's loan loss reserve calculations. PAM invokes the doctrine of truth as an absolute defense to libel, Okla.Stat. Annot., Tit. 12, § 1441 (West Supp.1984), but we recognize that an incomplete quotation taken out of context, while technically accurate and verbatim, may nonetheless be misleading. We hasten to add, however, that simply because a statement is misleading does not make it libelous.

The parties debate at length whether Peat's counterclaim is permissive or compulsory under Rule 13 of the Federal Rules of Civil Procedure. From PAM's standpoint, the claim is merely permissive because it arose from PAM's July 28th letter, which is not the "same transaction" as Peat's December 31st audit report. From Peat's perspective, since its December audit was the subject of PAM's July letter, both events do arise from the "same transaction." The Court finds it unnecessary to reach a determination of the Rule 13 issue because in either posture as a compulsory or permissive counterclaim, the facts do not supply the requisite elements of libel.

■■■ Given the terms of PAM's letter and the relations of the parties, it appears beyond doubt that Peat can prove no set of facts which would entitle it to relief on its claim of libel. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). PAM's motion to dismiss Peat's counterclaim for libel in CIV–82–1357–W and CIV–83–1583–W is GRANTED.