1998 OK 30

GAYLORD ENTERTAINMENT COMPANY, d/b/a The Oklahoma Publishing Co., The Oklahoma Publishing Company, Petitioners,

v.

The Honorable Donald D. THOMPSON, Judge of the District Court of Creek County, Twenty–Fourth Judicial District, Respondent,

and

Jessie Huff Durham, an individual, and Beau Williams, an individual, Real Parties in Interest.

WORLD PUBLISHING CO., an Oklahoma corporation, Petitioner,

v.

The Honorable Donald D. THOMPSON, Judge of the District Court of Creek County, Twenty–Fourth Judicial District, Respondent,

and

Jessie Huff Durham, an individual, and Beau Williams, an individual, Real Parties in Interest.

Nos. 88925, 88935.

Supreme Court of Oklahoma.

April 14, 1998.

Rehearing Denied June 24, 1998.

**134**

B.J. Rothbaum, Von Russell Creek, Linn & Neville, Oklahoma City, for Petitioners Gaylord Entertainment Company and The Oklahoma Publishing Company in No. 88925.

J. Schaad Titus, Boone, Smith, Davis, Hurst & Dickman, Tulsa, for Petitioner World Publishing Co. in No. 88935.

W.C. Sellers, W.C. "Bill" Sellers, Inc., Sapulpa, and W.C. Sellers, Jr., Bill Sellers, Sapulpa, for Real Parties in Interest in Nos. 88925 and 88935.

OPALA, Justice.

¶1 The dispositive issue tendered by the two consolidated original proceedings for a writ of prohibition is whether the district court action against the petitioners, now pending before the respondent judge, is dismissible for want of actionable quality. We draw from three different sources of law [1] to

1. For a discussion of the statutory, common-law and constitutional-law sources, see Parts IV, V and VI, *infra*.

conclude that (a) when measured by the applicable *Conley v. Gibson*[2] standard, the plaintiffs (corespondents herein) can muster no set of facts in support of their quest for relief against the petitioners under any legal theory and (b) the writs should issue to arrest further proceedings against the petitioners in the action below.

## I

## THE ANATOMY.

¶2 This court's original cognizance is invoked to prohibit further proceedings in an action by two lawyers, Jessie Huff Durham and Beau Williams [respondents or plaintiffs], against World Publishing Company, the Gaylord Entertainment Company d/b/a The Oklahoma Publishing Co., and The Oklahoma Publishing Company [collectively called newspapers, petitioners or defendants]. The lawsuit was also pressed against Citizens Against Lawsuit Abuse, Inc. and five of its leaders [collectively called CALA], *entities who are not parties to this original proceeding.*[3]

¶3 Plaintiffs allege in their second amended petition below that (a) the defendants joined in a conspiracy to undermine the democratic process and to injure the plaintiff "trial lawyers"[4] by publishing "false, deceptive, fraudulent, and defamatory statements" relating to the plaintiffs, their profession and to the judicial branch of government, (b) the statements were disseminated with actual malice and with knowledge of their falsity or in reckless disregard of the truth of the statements, (c) the defendants' conduct has injured their reputations as well as the business property interest in their profession, and (d) the defendants' actions

were intentionally inflicted, which caused them extreme emotional distress. Plaintiffs attached to the first amended petition copies of five articles published in The Daily Oklahoman and in the Tulsa World about CALA's efforts to bring about "tort reform" through the initiative process.[5] Also attached to their first amended petition below is a copy of CALA's allegedly offending communication, a November 14, 1994 letter[6] written on its letterhead which (a) *states* that CALA was formed to change the "Constitution in a manner which will materially reduce the number of frivolous lawsuits," (b) *explains* that CALA's goal is to secure the passage of two initiative measures—one to place a cap on the recovery of punitive damages and the other to limit the contingency fee rate a lawyer may charge, and (c) *solicits* new members as well as financial contributions for CALA's initiative petition drive. After unsuccessfully pressing at nisi prius for dismissal of the second amended petition, the two newspapers and CALA brought in this court three separate causes to prohibit the respondent judge from further proceeding against them in the district court tort action. We dealt with the issues pressed by CALA and granted the writ in *Brock v. Thompson.*[7] There, we held that the state constitutional shield surrounding political activity protected the CALA defendants (promoters of the initiative petition) from the *burden of defending themselves in court* for the conduct that forms the basis of the claim sought to be prosecuted against them.[8] Applying the *Conley v. Gibson* test, this court held that *no* acts by the CALA defendants could be shown to provide a ground for relief against the petitioners based on any legal theory

2. 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

3. For the CALA claim's disposition, see *Brock v. Thompson,* 1997 OK 127, 948 P.2d 279.

4. The plaintiffs below use the term "trial lawyer" *not* to designate a general forensic legal practi-

tioner but to describe one who advocates the rights of *tort claimants.*

5. Copies of the OPUBCO and Tulsa World articles are attached to this opinion and identified as Appendices A–D.

6. *See* Appendix E.

7. *Brock, supra* note 3.

8. *Brock, supra* note 3 at 297.

pressed.[9] We now turn to the separately brought causes by the newspapers, which stand consolidated for disposition by a single opinion.

### Incorporation by Reference of the Plaintiffs' Exhibits

■ ¶ 4 Although none of the newspaper articles was affixed to the second amended petition below, these instruments were made part of the materials pressed at nisi prius in the petitioners' dismissal quest and stand tendered by them for our consideration here. The parties are hence deemed to have adopted these materials as fit for our analysis in entertaining this cause.[10]

9. *Brock, supra* note 3 at 297.

10. Federal Rule 10(c) jurisprudence is instructive upon this court's consideration of the newspaper articles as part of the record here. A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Rule 10(c), Federal Rules of Civil Procedure [Fed. R.Civ.P.]; *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). When a plaintiff fails to attach to the complaint (or incorporate by reference) a pertinent document upon which it solely relies and which is integral to the complaint (or referred to in the complaint), a defendant may introduce the document as part of his motion attacking the pleading. The submission of the exhibits is not considered a reliance on outside materials so as to require the recasting of the dismissal motion into one for summary judgment. *See, e.g., Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994) ("documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered"), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) ("a court may consider an indisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Venture Assoc. Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim); *Cortec, supra,* at 48 (where a plaintiff has actual notice of all of the information in a motion to dismiss and has relied upon the documents in framing the complaint, the dismissal quest need not be recast into one for summary judgment), *cert. denied sub nom. Cortec Indus.*

## II

### RELIEF SOUGHT IN THIS COURT

■ ¶ 5 In this original proceeding the petitioners seek dismissal of the district court action against them because of its chilling effect on their fundamental-law liberties that are at stake in the trial court process— *i.e.,* the constitutional right of free press and freedom of political speech.[11]

■ ¶ 6 A prerogative writ that may be granted in the exercise of this court's supervisory control over inferior courts,[12] prohibition will lie to arrest unauthorized or excessive use of judicial force.[13] While erroneous denial of a motion to dismiss is not usually an error for which prohibition will lie,

*Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

The text of Federal Rule 10(c) is incorporated verbatim in the Oklahoma pleading code (12 O.S.1991 § 2010(C)). *See* Committee Comment to 12 O.S.1991 § 2010(C). The terms of § 2010(C) provide that "[s]tatements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." The respondents in the present case have objected neither to the authenticity of the publications nor to their submission for our consideration in this original action. The newspaper articles were (a) attached to the original petition below, (b) referenced to in the second amended petition, (c) attached to the petitioners' separate motions to dismiss the second amended petition and to their application in this court, and (d) referenced to in the parties' brief in this cause. By their joint use of these materials, the parties to this original action recognize that the physical attachments to the first petition (below) are an integral part of the pleadings by which the action below is sought to be prosecuted.

11. For a discussion of the petitioners' constitutional guarantees at stake, see *infra* note IV.

12. Art. 7 § 4, Okl. Const.; *Marsh v. District Court In and For Muskogee County,* 1978 OK 74, 579 P.2d 832, 834; *Rey v. Means, In and For Tulsa Cty.,* 1978 OK 4, 575 P.2d 116, 118.

13. *See Oklahoma Tax Com'n v. Ricks,* 1994 OK 115, 885 P.2d 1336, 1337; *Lee v. Hester,* 1982 OK 30, 642 P.2d 243, 246; *Moses v. Hoebel,* 1982 OK 26, 646 P.2d 601, 603–04; *State ex rel. Williamson v. Evans,* 1957 OK 304, 319 P.2d 1112, 1116.

original cognizance will be taken to *prohibit the use of unauthorized or excessive judicial force in entertaining nonactionable claims* where, as here, *valued fundamental-law rights are clearly implicated and their immediate protection from encroachment appears absolutely necessary.*[14]

### ¶7 *The Availability of the Prerogative Writ Sought Herein Must Be Assayed by the Conley v. Gibson Standard*[15]

■ ¶8 A motion to dismiss for failure to state a cause of action will not be sustained unless it should appear *without doubt* that the plaintiff can prove no set of facts in support of the claim for relief.[16] Drawing from three legal sources—statutory, common law and constitutional—we hold that, for the reasons to be explained in Parts IV, V and VI *infra*, no relief *may be available* on the claim sought to be prosecuted against World Publishing Company, Gaylord Entertainment Company and The Oklahoma Publishing Company. Because the respondents' action *against* these petitioners is utterly devoid of

actionable quality, it cannot withstand the petitioners' quest for dismissal.

### III

### THE PARTIES' ARGUMENTS

¶9 The petitioners (newspapers) argue that the news articles and editorials[17] in contest are privileged under the statutory (12 O.S.1991 § 1443.1)[18] and common-law fair report privilege. According to petitioners, the initiative process (including the fundraising stage)[19] is authorized and regulated by constitutional[20] and statutory law[21] and hence falls under the § 1443.1 category of "other proceeding authorized by law." They argue the publications are protected by the First Amendment as rhetorical hyperbole in the nature of core political speech. Lastly, petitioners submit that venue in Creek County was mislaid.[22]

¶10 The plaintiffs counter that when the newspapers pledged large sums of money to CALA, they became "newsmakers" (rather than reporters) and ceased covering the de-

---

**14.** *Sabouri v. Hunter*, 1979 OK 95, 596 P.2d 891, 892–93 (prohibition was granted to guard against the chilling effect of the petitioner's act of invoking his Fifth Amendment privilege against self incrimination). Prohibition is appropriate in public interest cases. *See Davis v. Thompson*, 1986 OK 38, 721 P.2d 789, 790; *State ex rel. York v. Turpen*, 1984 OK 26, 681 P.2d 763, 764–65; *Draper v. State*, 1980 OK 117, 621 P.2d 1142, 1147; *Powell v. Seay*, 1976 OK 22, 553 P.2d 161, 165; *Wiseman v. Boren*, 1976 OK 2, 545 P.2d 753, 756–57.

**15.** *Supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

**16.** The terms of 12 O.S.1991 § 2012(B) provide in pertinent part:
"Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:
* * *
6. *Failure to state a claim upon which relief can be granted;* ..." (Emphasis added.)
"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley, supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102; *Atchison, Topeka and Santa*

*Fe Ry. Co. v. Buell*, 480 U.S. 557, 568 n. 15, 107 S.Ct. 1410, 1417 n. 15, 94 L.Ed.2d 563 (1987); *Groce v. Foster*, 1994 OK 88, 880 P.2d 902, 906; *Dyke v. Saint Francis Hospital, Inc.*, 1993 OK 114, 861 P.2d 295, 298–299; *Frazier v. Bryan Mem. Hosp. Auth.*, 1989 OK 73, 775 P.2d 281, 289. *See also* Committee Comment to 12 O.S. 1991 § 2012(B), which observes that § 2012(B) is virtually the same as Rule 12(b), Federal Rules of Civil Procedure.

**17.** For the text of the Tulsa World and OPUBCO articles and editorials, see Appendices A—D.

**18.** Although OPUBCO's argument below does not *explicitly invoke § 1443.1*, its position that its news article is a fair and accurate account of the proceedings implicitly relies on the statutory privilege.

**19.** For support petitioners cite 74 O.S.1991 §§ 4201 et seq., particularly noting §§ 4214, 4219 and 4223.

**20.** Art. 24 § 3, Okl. Const.

**21.** Petitioners direct our attention to the text of 34 O.S.1991 §§ 1 et seq., the statutory provisions governing campaigns to raise funds for initiative petitions.

**22.** Today's prohibition makes the venue issue unnecessary to reach.

velopments fairly and accurately. According to the plaintiffs, the petitioners "conspired" to publish *false* and *defamatory* statements about the respondents as "trial lawyers" in order to limit their ability to represent their clients against the newspapers and CALA in tort actions. The plaintiffs argue that these actions amount to intentional infliction of emotional distress and injury to their reputation as well as to their property interest in the profession they practice.

## IV

¶ 11 **THE PUBLICATIONS IN QUESTION ARE PROTECTED AGAINST CIVIL LIABILITY AS POLITICAL SPEECH**

### A.

¶ 12 *The Protection of Oklahoma's Free–Speech–and–Press Guarantee*

¶ 13 Restraint upon free speech is prohibited by the terms of Art. 2 § 22, Okl. Const.[23] The State's free-speech-and-press guarantee protects the public by allowing issues to be freely and vigorously discussed.[24] There is a recognized need in a free, self-governing society for dissemination of information of fundamental importance to the people.[25] Without accurate media coverage and discussion of issues that are of governmental interest, it is doubtful that the general public would be able to make informed decisions and participate intelligently in their governance; nor would representatives of government be able to perform their assigned tasks effectively.[26] *The protection of this activity is essential for an effective democracy.* The fundamental law's free-speech-and-press components are intended to facilitate the functioning of a democratic government by protecting speech that relates to the self-governing process.

¶ 14 The phrase "free speech" sources." *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945). "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech." *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 928, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982). *See also, Wright v. Grove Sun Newspaper Co., Inc.,* 1994 OK 37, 873 P.2d 983; *State ex rel. Dept. of Transp. v. Pile,* 1979 OK 152, 603 P.2d 337, 340, 339 n. 1.

**23.** The terms of Art. 2 § 22, Okl. Const., are:
"*Every person may freely speak, write, or publish his sentiments on all subjects,* being responsible for the abuse of that right; and *no law shall be passed to restrain or abridge the liberty of speech or of the press.* In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted." (Emphasis supplied.)
**The Oklahoma Constitution's protection of free speech *is far more broadly worded* than the First Amendment's restriction on governmental interference with speech.** The latter states in pertinent part that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**24.** The free-speech guarantee gives each citizen an equal right to self-expression and to participation in self-government. See, e.g., *Carey v. Brown,* 447 U.S. 455, 459–463, 100 S.Ct. 2286, 2289–2291, 65 L.Ed.2d 263 (1980); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284 (1971).

**25.** The free-speech guarantee protects the rights of listeners to "the widest possible dissemination of information from diverse and antagonistic

**26.** In *Cox Broadcasting Corporation v. Cohn,* 420 U.S. 469, 491–92, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975), the Court observes:
"[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he *relies necessarily upon the press* to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally."

is often equated with "political speech".[27] The term "political" pertains "to the policy or the administration of government" or to "the influence by which individuals of a state seek to determine or control its public policy."[28] *Political speech is hence any expression concerning the ideas and art of governing.*[29] Protected *political speech* is vital to self-government. It must be available without any governmental hindrance. There should be "no potential interference" with a meaningful dialogue of ideas concerning self-government; nor should there be a threat of liability that causes "self-censorship."[30] Pro-

tected speech not only encapsulates the rights of the speaker, but also those of the listener.[31]

¶ 15 The constitutional freedom of expression and discussion, if it is to fulfill its historic function, must embrace all issues about which information is needed (or appropriate) to enable the members of society to cope with the exigencies of their time.[32] *Advocacy for or against a proposed law is the purest form of political speech.*[33] The state cannot hence burden the free exchange of political ideas about the objective of an initiative proposal.[34]

27. As one legal commentator notes, "[w]hen the Founding Fathers talked about free speech they were talking about political speech—and what they were seeking to protect specifically was the ability openly to criticize government." Robert J. Wagman, The First Amendment Book at 86 (1991).

28. Black's Law Dictionary at 1158 (6th ed.1990).

29. The term "political speech" is used to encompass all of "those activities of thought and communication by which we govern." *See* Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup.Ct. Rev. 245, 255.

30. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986); *Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–60, 105 S.Ct. 2939, 2945–46, 86 L.Ed.2d 593 (1985); *Claiborne Hardware Co., supra* note 25, 458 U.S. at 926–28, 102 S.Ct. at 3432–34.

31. The primary concern of the free-speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the message. *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring); *Cohen, supra* note 24, 403 U.S. at 24, 91 S.Ct. at 1787; *Kleindienst v. Mandel*, 408 U.S. 753, 762–765, 92 S.Ct. 2576, 2581–2582, 33 L.Ed.2d 683 (1972); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763–765, 96 S.Ct. 1817, 1826–1827, 48 L.Ed.2d 346 (1976).

32. *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940).

33. In *Meyer v. Grant*, 486 U.S. 414, 421–424, 108 S.Ct. 1886, 1892–93, 100 L.Ed.2d 425 (1988), the Court held that the circulation of initiative petitions and the concomitant exchange of political ideas constitute "core political speech." A state, though generally free to regulate its own initia-

tive process, is limited in the extent to which it may burden the communication of ideas about the political change at issue in an initiative proposal that occurs during petition circulation. *Id.* 486 U.S. at 423–27, 108 S.Ct. at 1893–94. *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 776–777, 98 S.Ct. 1407, 1415–1416, 55 L.Ed.2d 707 (1978) (speech on an income-tax referendum "is at the heart of the First Amendment's protection").

34. *Meyer, supra* note 33, *teaches that a state has no "power to limit discussion of political issues raised in initiative petitions."* 486 U.S. at 422, 108 S.Ct. at 1892 (emphasis supplied). The First Amendment affords the broadest protection to political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). The discussion of public issues is integral to the operation of the system of government established by our Constitution. Speech on public issues occupies the *"highest rung of the hierarchy of First Amendment values,"* and is entitled to special protection. *Claiborne, supra* note 25, 458 U.S. at 913, 102 S.Ct. at 3425 (emphasis supplied); *Carey, supra* note 24, 447 U.S. at 467, 100 S.Ct. at 2293; *Dun & Bradstreet, supra* note 30, 472 U.S. at 758–59, 105 S.Ct. at 2944–45 (speech on matters of public concern is at the heart of the First Amendment's protection); *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). Although First Amendment protections are not confined to "the exposition of ideas," (*Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948)), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs...." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16

¶ 16 The tension between the right to disseminate information to the public and the law of defamation is not new. It is mirrored in the eighteenth-century common law of England,[35] which developed the underpinnings for the constitutional immunity applied today.[36] Because the *mere threat* (or *actual imposition)* of liability may impair the unfettered exercise of free speech,[37] the constitution imposes stringent limitations upon its permissible scope.[38] *The State can neither impede the exchange of ideas nor make that exchange costly through litigious action.* Even the *mere threat* of unfounded liability would have a "chilling effect" on the discussion of public issues.[39] No less of a limitation is imposed when, as in this case, the action is taken by a private plaintiff under the aegis of state civil law. Civil actions by private parties will violate the free-speech guarantee when the discussion alleged to be defamatory concerns public issues and no unlawful activity occurs.[40]

¶ 17 The respondents argue that the speech in suit does not enjoy protected political speech status because there is no evidence that an initiative petition was actually being drafted. Their narrow approach is not the standard for gauging a publication's status as political speech. The speech complained of as libelous concerns the CALA group's interest in changing state tort law *via* the initiative method. The political process of popular lawmaking is clearly the subject of the petitioners' news articles and editorials. It is immaterial that an initiative petition had not been filed at the time of the CALA letter and of the articles' publication. This is so because *advocacy that launches an initiative drive is an essential part of the political process designed ultimately to impact the government.* If there is a rational connection between the communication or utterance complained of as defamatory and the author's quest for a political change, the communication should be viewed as protected political speech and a means of securing a

L.Ed.2d 484 (1966). *See also Brock, supra* note 3 at 288–89.

35. The eighteenth-century conflict provided the legal culture for the growth of the common-law fair-report privilege, which is of fairly recent origin in English jurisprudence. It came into existence in the late eighteenth century. Before then reporting about Parliament was considered "a reflection on government", deemed seditious libel, and punished. As the public learned to read, Parliament found it more difficult to control the dissemination of information by the press. Finally, by 1771, the House of Commons grudgingly withdrew from the practice of citing newspapers for reporting speeches and thereafter confined its contempt power to charges for misrepresenting speeches or for libelous attacks on the reputation of individual members of Parliament. In the early nineteenth-century English courts were unwilling to apply the fair-report privilege to occasions other than judicial or Parliamentary proceedings. The privilege was enlarged legislatively in 1881 by Parliament's enactment of the Newspaper Libel and Registration Act which extended a qualified privilege to all meetings called for a lawful purpose and open to the public, if republication of the material was for public benefit. RESTATEMENT (SECOND) OF TORTS § 611 reflects the status of the common-law fair-report privilege *after* the enactment of legislation. For a discussion of the historical antecedents of the fair-report privilege, see Fredrick Seaton Siebert, FREEDOM OF THE PRESS IN ENGLAND 1476–1776 (1965). *See Wright, supra* note 25 at 987 n. 9.

36. The early history of the United States reflects the ideology that gave birth to the free-speech guarantee. In crafting what became the United States Constitution, James Madison fulfilled the need to provide the minority position a platform to express its viewpoint. Madison proposed what became the First Amendment to the Constitution to protect the right to speech and the freedom of the press. *See* John O. McGinnis, *Once and Future Property-based Vision of the First Amendment,* 63 U.CH L.REV 49, 73 n. 103 (1996); Joseph C. Wilkinson, Jr., Frank D. Zielinski, *A Bicentennial Transition: Modern Alternatives to Seventh Amendment Jury Trial in Complex Cases,* 37 U. KAN. L.REV. 61, 82 (1988).

37. *Greenbelt Cooperative Pub. Assoc., Inc. v. Bresler,* 398 U.S. 6, 12, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970).

38. *Id.,* citing *Pauling v. Globe–Democrat Publishing Co.,* 362 F.2d 188 (8th Cir.1966), *cert. denied,* 388 U.S. 909, 87 S.Ct. 2097, 18 L.Ed.2d 1347 (1967).

39. *Philadelphia, supra* note 30, 475 U.S. at 777, 106 S.Ct. at 1564 (the "chilling effect" of the threat of liability will result in media self-censorship "antithetical to the First Amendment's protection of true speech on matters of public concern"); *Dun & Bradstreet, supra* note 30, 472 U.S. at 759–60, 105 S.Ct. at 2945–46.

40. *Claiborne Hardware Co., supra* note 25, 458 U.S. at 918, 102 S.Ct. at 3428.

change in the government's conduct of its business. While the so-called *offending conduct* may be injurious (or offensive) to the plaintiffs' interests, it nonetheless constitutes protected political speech which must be more jealously and intensely guarded than any other form of permissible expression.[41] "[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."[42] *The law's protection of free expression recognizes "no such thing as a false idea."*[43]

■■■ ¶ 18 *Absent some element of clearly unlawful activity by the speaker, the State can neither punish political speech nor make its utterances costly by imposing civil liability.* Under our system of government, no one can be made civilly responsible or accountable to the government for robustly pressing political views that others oppose with equal vigor. *To allow a defamation action to continue once it has been determined that the speech concerned protected political ideas and did not incite lawless action is in itself a violation of the constitution.*[44]

·'■■■ ¶ 19 We recognize that the constitutional right to freedom of speech has never been considered absolute.[45] Federal and state defamation jurisprudence that implicates the freedom-of-speech protection recognizes exceptions to the constitutional guarantees.[46] The expression in contest here

41. As Justice Brandeis said in his concurring opinion in *Whitney, supra* note 31, 274 U.S. at 375, 47 S.Ct. at 648, "[t]hose who won our independence believed that * * * the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government." This, we might add, is a fundamental principle of the Oklahoma government as well.

42. *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969). " '[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.' " *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55–56, 108 S.Ct. 876, 881–882, 99 L.Ed.2d 41 (1988) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 745–44, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)); *Members' of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65, 72, 103 S.Ct. 2875, 2879, 2883, 77 L.Ed.2d 469 (1983); *Carey, supra* note 24, 447 U.S. at 462–63, 100 S.Ct. at 2291; *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 63–65, 67–68, 96 S.Ct. 2440, 2448–50, 49 L.Ed.2d 310 (1976); (plurality opinion); *Buckley v. Valeo*, 424 U.S. 1, 16–17, 96 S.Ct. 612, 633–634, 46 L.Ed.2d 659 (1976); *Grayned v. Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302–2303, 33 L.Ed.2d 222 (1972); *Mosley, supra* note 24, 408 U.S. at 95, 92 S.Ct. at 2289; *Bachellar v. Maryland*, 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570 (1970).

43. *Hustler, supra* note 42, 485 U.S. at 51, 108 S.Ct. at 879 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974)).

44. *Claiborne, supra* note 25, 458 U.S. at 928, 102 S.Ct. at 3433–34.

45. *McCormack v. Oklahoma Publishing Co.*, 1980 OK 98, 613 P.2d 737, 741.

46. The U.S. Supreme Court has recognized that some types of speech are entirely excluded from (or entitled only to narrowed) constitutional protection. Freedom of speech does not protect (a) *obscene materials* (*Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973); *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957)); (b) *child pornography* (*New York v. Ferber*, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982)); (c) *fighting words* (*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942)); (d) *incitement to imminent lawless activity* (*Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)); and (e) *purposefully-made (or recklessly-made) false statements of fact,* such as libel, defamation, or fraud (*see, e.g., Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *Gertz, supra* note 43, 418 U.S. at 348–49, 94 S.Ct. at 3011–12; *Beauharnais v. Illinois*, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952); *Schneider v. State of N.J.*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). Speech that is *vulgar, offensive,* and *shocking* is not entitled to absolute constitutional protection under all circumstances. *FCC v. Pacifica Foundation*, 438 U.S. 726, 747, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978). The Court has recognized constitutional limits on the *type of speech* that may be the subject of defamation actions. In cases where the statements cannot reasonably be interpreted as stating actual facts about the individual, those statements are protected under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990); *Hustler,*

is not excluded from absolute protection by any exception to the time-honored fundamental-law principles. It is always a question for the court to determine as a matter of law whether a published statement is within the protected class of speech.[47] Courts must make an independent examination of the record to assure that their judgment does not constitute a forbidden intrusion on the field of free expression.[48]

 ¶ 20 A careful review of the publications in contest reveals constitutionally protected political speech. The respondents do not dispute that the two news reports[49] accurately reflect what was said by the persons quoted in the articles. In the news accounts no opinion is expressed about the topic of tort reform. Rather, what is given is a factual report of the proponents' and opponents' views of the initiative campaign to effect a change in the law. While the editorials certainly voice an opinion about the then-perceived legal system's tolerance for exaggerated damage claims, nothing in the writings targets (or is defamatory of) the plaintiffs or of the legal profession itself.

¶ 21 The petitioners here cannot be haled into court for utterances or written expressions that fall under the rubric of political speech. To impose civil liability for reporting and editorializing *about a significant political movement advocating a change in the law* would be a serious violation of the State's

free-speech-and-press guarantee.[50] The constitutional safeguard operates to render the petitioners' pled conduct impervious to civil liability.

### B.

### ¶ 22 *The Right To Petition For Redress of Grievances*

¶ 23 The plaintiffs argue that, because the newspapers "pledged tens of thousands of dollars to CALA and were pledge-card carrying members of the CALA conspiracy," they stepped out of their role of news reporters and became newsmakers (or news creators). According to the plaintiffs, when the newspapers did this, they were no longer reporting fairly and accurately, but instead were furthering the ends of the conspiracy of which they were a part. This argument raises the question whether the actions of the newspapers—*qua* "pledge-card carrying" supporters of the CALA tort reform movement—are also to be deemed as shielded by the constitutional right to petition the government for redress of grievances. Publications that advocate in support of a campaign to change the law by *popular lawmaking* are clearly beamed at members of the "largest legislative body in the state"—the electorate.[51]

---

**47.** *Winters v. Morgan,* 1978 OK 24, 576 P.2d 1152, 1154. *See also Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694–95, 105 L.Ed.2d 562 (1989).

*supra* note 42, 485 U.S. at 50, 108 S.Ct. at 879; *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). A public official (or public figure) who prosecutes a defamation case must prove that the publication was a defamatory falsehood and that the statement was made with actual malice (with knowledge that it was false or with reckless disregard of whether it was false). *New York Times, supra* note 34, 376 U.S. at 279–280, 84 S.Ct. at 725–26; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967). For both public officials and public figures, a showing of actual malice is subject to a clear and convincing standard of proof. *Gertz, supra* note 43, 418 U.S. at 342, 94 S.Ct. at 3008.

**48.** *New York Times, supra* note 34, 376 U.S. at 285, 84 S.Ct. at 728–29; *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984); *Locricchio v. Evening News Ass'n,* 438 Mich. 84, 110, 476 N.W.2d 112 (1991).

**49.** *See* Appendices A and C for the petitioners' news articles.

**50.** In our pronouncements of state constitutional law, cited federal jurisprudence is used *solely* for guidance where there is a lack of state decisions. Federal case law provides a logical framework for determining the scope of the protection guaranteed by Oklahoma constitutional law. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).

**51.** *In re Initiative Petition No. 23, State Question No. 38,* 35 Okl. 49, 127 P. 862, 866 (1912 ).

¶ 24 The right to petition the government for redress of grievances is safeguarded in Art. 2 § 3, Okl. Const.[52] This constitutional guarantee, which embodies the right of the people—collectively—to pursue political ends through group action, is a basic aspect of self government. Legitimate attempts to influence government action are absolutely protected from civil liability by this fundamental guarantee.[53] The clear import of the right-to-petition clause is to protect from litigation those who attempt to induce the passage, repeal or the enforcement of law, or to solicit governmental action, even though the result of such activities may indirectly cause injury to others.[54]

¶ 25 Just as we refrained from doing in *Brock*,[55] so too we need not here address the issue whether legislative initiative activities—generally as well as particularly in pre-circulation stages—also implicate the state petition-for-redress-of-grievances clause. Neither do we answer today whether the constitutional shield of that clause extends to the political expression of newspapers published during any stage of a popular lawmaking's course.[56] Those issues, although indirectly implicated here, are left to be resolved another day.

¶ 26 V

¶ 27 THE PUBLICATIONS IN QUESTION ARE ALSO PROTECTED FROM BEING ACTIONABLE BY THE § 1443.1 PRIVILEGE OF FAIR REPORT AND FAIR COMMENT

¶ 28 The 12 O.S.1991 § 1443.1[57] privilege protects from civil liability the pub-

---

52. The provisions of Art. 2, § 3, Okl. Const., are: The *people have the right* peaceably to assemble for their own good, and *to apply to those invested with the powers of government for redress of grievances by petition*, address, or remonstrance. (Emphasis added.)
Oklahoma's right-to-petition clause, *supra*, is similar to, and was no doubt taken from, Amend. I (cl.6) of the U.S. Constitution, which provides that "Congress *shall make no law … abridging … the right of the people … to petition the government for a redress of grievances."* (Emphasis supplied.) Because there is a paucity of Oklahoma jurisprudence that construes the state petition-for-grievance clause, we look to analogous federal case law only for guidance. As the Court notes in *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945), this is a basic freedom in a participatory government, closely related to freedom of speech; together these are the "indispensable democratic freedoms" that cannot be abridged if a government is to continue to reflect the desires of the people.

53. For an in-depth discussion of the origins and historical appeals to the protection of the petition clause, see *Brock, supra* note 3 at 289 n. 38. In *Brock* the activities of the CALA defendants in support of a proposed legal change were held to constitute *clearly protected core political speech. Id.* at 295.

54. *Brock, supra* note 3 at 295, teaches that (a) it is not unlawful to join with others in a common effort to bring about legal change by lawful means (*via* the initiative or by other methods of petitioning the government); (b) if others agree to participate in activities and aims that are constitutionally protected, there is no actionable civil conspiracy, and (c) a conspiracy to carry on an activity that is lawful and constitutionally protected cannot be deemed tortious.

55. *Brock, supra* note 3 at 289.

56. For applicability of the redress-of-grievances clause to artificial entities, see *United Mine Workers of America, Dist. 12 v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *N.A.A.C.P. v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The availability of protection for petitioning activity involving *private grievances* is implicit in *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 743, 103 S.Ct. 2161, 2169, 2170, 76 L.Ed.2d 277 (1983) (NLRB's order to terminate plaintiff's state-court action filed in response to allegedly unlawful union activity is reversed). "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances…. The First Amendment interests [are] involved in private litigation…." See *McDonald v. Smith,* 472 U.S. 479, 484, 105 S.Ct. 2787, 2791, 86 L.Ed.2d 384 (1985) ("filing a complaint in court is a form of petitioning activity" unless the complaint is "baseless litigation"); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972) ("[t]he right of access to the courts is indeed but one aspect of the right of petition").

57. The terms of 12 O.S.1991 § 1443.1 provide in pertinent part:
"A. A privileged publication or communication is one made:
First. In any legislative or judicial proceeding or any other proceeding authorized by law;
Second. In the proper discharge of an official duty;

lication of (a) an accurate account of *judicial, legislative or other proceedings authorized by law*,[58] as well as (b) opinions and criticisms upon the official proceeding.[59] The statutory privilege's *fair-report* component protects the republication of accurate accounts of official action or proceedings, even though the reports may contain defamatory statements.[60] The historical antecedents of this affirmative defense lie in the common law's fair-report privilege.[61] The statutory *comment-and-criticism privilege*, on the other hand, affords legal immunity for the *expression of opinion* on matters relating to official proceedings.[62] The defense of fair comment is predicated upon the principle that the interests of society are furthered through a free discussion of public affairs and matters of public interest.[63] The statu-

---

> Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers...."

**58.** For cases applying the *statutory fair-report privilege*, see: (a) *Cooper v. Parker–Hughey*, 1995 OK 35, 894 P.2d 1096 (a prosecution witness in a criminal trial is immune from civil liability for damages caused by his (or her) testimony). In describing the range of the privilege in judicial proceedings, the court observes that "[u]nder this statute and its predecessor ... attorneys, parties and witnesses are immune from defamation suits where those suits are based upon communications made during or preliminary to judicial proceedings as long as the communication is in some way relevant to the proceeding." *Id.* at 1099 (citing *Kirschstein v. Haynes*, 1990 OK 8, 788 P.2d 941, 948, *Hammett v. Hunter*, 189 Okl. 455, 117 P.2d 511 (1941)).(b) *Wright, supra* note 25 at 990 (the republication of statements made at a district attorney's press report was privileged). (c) *Crittendon v. Combined Communications Corp.*, 1985 OK 111, 714 P.2d 1026, 1028–29 (the statements made in a television broadcast concerning a medical malpractice action brought against a physician were a fair and true report of a default hearing and hence privileged under § 1443.1).

**59.** For cases dealing with the statutory privilege of fair comment and criticism, see *Price v. Walters*, 1996 OK 63, 918 P.2d 1370; *Hennessee v. Mathis*, 1987 OK CIV 35, 737 P.2d 958.

**60.** The purpose of the fair-report privilege is to assure that people who report on defamatory statements made in the course of official proceedings are protected from civil liability. *See Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir.1981). The media are under no obligation to investigate the truth of any charges made in the official proceeding before publishing them. David A. Elder, THE FAIR REPORT PRIVILEGE 5, 111–13 (1988). The fair-report privilege is also known as "official report privilege," "public records privilege," "reporter's privilege," or "public eye doctrine." *See* D. Gillmor, J. Barron, T. Simon & H. Terry, MASS COMMUNICATION LAW 250 (5th ed.1990); R. Sack, LIBEL, SLANDER, AND RELATED PROBLEMS 316 (1980).

**61.** For the distinctions between the statutory and common-law privileges, see *Wright, supra* note 25 at 987. For a history of the common law's fair-report privilege, see *supra* note 35; *Wright, supra* note 25 at 985 n. 1; RESTATEMENT (SECOND) OF TORTS § 611.

**62.** Fair comment is a common-law defense to an action for defamation, which is generally privileged when it (a) *deals with* a matter of public concern, (b) *is based on* true or privileged facts, and (c) *represents* the actual opinion of the speaker, but is not made for the sole purpose of causing harm. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 110 S.Ct. 2695, 2702–03, 111 L.Ed.2d 1, 14 (1990). The fair-comment privilege developed because common-law courts early recognized that actions for defamation could frustrate the valuable discourse fostered by the free flow of evaluative ideas. Rodney A. Smolla, LAW OF DEFAMATION § 6.02[1] (1994). In its earliest form, the privilege provided limited protection for expressions of opinion. Over time, fair comment was deemed to protect expressions of opinion about the conduct of public officials and political candidates regardless of the reasonableness of the opinion. *Id.* As one commentator observed, "[I]t must be conceded that fair comment sometimes enables journalists and others to escape liability for defamatory language which offends the taste and moral sense of a substantial part of the community. This occasional abuse is part of the price of free speech...." Note, *Fair Comment*, 62 HARV.L.REV. 1207, 1216 (1949). According to the majority rule, the privilege applies only to an expression of opinion, not to a false statement of fact, whether it is expressly stated or implied in an expression of opinion. *Id.*, 497 U.S. at 13, 110 S.Ct. at 2702–03 (citing RESTATEMENT (SECOND) OF TORTS § 566 (1977)).

**63.** *See, e.g., Mashburn v. Collin*, 355 So.2d 879, 882 (La.1977); *Golden North Airways, Inc. v. Tanana Publishing Co.*, 15 Alaska 303, 218 F.2d 612, 626–27 (9th Cir.1955); *Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C.App.1965). The common-law privilege was "qualified" in that it could be lost if the plaintiff showed that the defendant did not, in fact, actually hold the stated opinion but nevertheless published the comment, or otherwise intended to do harm. Veeder, *Freedom of Public Discussion*, 23 HARV. L. REV. 413, 425–26 (1910); RESTATEMENT OF TORTS

tory privilege's underlying rationale is that if any member of the public were present, he (or she) might see and hear the statements made at a public proceeding, so that "the reporter is merely a substitute for the public eye." [64]

¶ 29 These statutory privileges are more narrow in scope than their common-law counterparts. The statute restricts the defense of fair report and fair comment to republications in the course of *official action or proceedings*, whereas the common-law privilege extends to communications on matters of public interest.[65] The § 1443.1 shield from state-law liability, much like its common-law predecessor,[66] imposes upon the defendant the duty of interposing the statutory privilege as an affirmative defense and of proving its elements.[67] In sum, the statutory fair-report and comment-and-criticism privileges provide the media with a complete

defense to libel on matters pertaining to official proceedings.

¶ 30 The process of changing statutory law or the State's constitution through the initiative route is a form of sanctioned popular lawmaking.[68] The initial activities reasonably designed to set in motion this legislative process constitute *lawmaking already begun* but not yet officially documented by precirculation filing.[69] *Lawmaking from beginning to end is a classical form of political process.*[70] Advocacy that launches an initiative drive is an essential part of the process for petitioning the electorate and for ultimately impacting the government. Within the meaning of the § 1443.1 privilege, a legislative proceeding *by the initiative method* begins with the first step leading toward the initiation of legislation. *That which is political speech in the*

§ 606(1)(b)(c) (1938). In addition, the comment could not constitute an attack on the character or motives of the plaintiff or his work. *Id.* at 424–25. The common-law fair-comment privilege was not limited to communications regarding government officials. It was applied to comments directed at those who were involved in matters of public concern and to candidates for public office. Its purview extends to anyone who presented himself or his services or goods to the public for its evaluation. RESTATEMENT OF TORTS §§ 606–609 (1938).

64. PROSSER AND KEETON ON TORTS § 115 (5th ed.1984). The statutory comment-and-criticism privilege is *broader* in one respect than the common-law fair-comment privilege. The latter "must be based on facts truly stated." *Nusbaum v. Newark Morning Ledger Co.*, 86 N.J.Super. 132, 206 A.2d 185, 195 (1965), citing *Leers v. Green*, 24 N.J. 239, 254, 131 A.2d 781, 789 (1957); *Rogers v. Courier Post Co.*, 2 N.J. 393, 66 A.2d 869, 873 (1949). Ordinarily a defendant must prove that the facts on which the comment is founded are true. Gatley, LIBEL AND SLANDER (5th ed.1960) § 580, at p. 322. The defense of fair comment "does not extend to misstatements of fact, however bona fide." *Id.*, § 588, at p. 325.

65. *Wright, supra* note 25 at 987; *see also* RESTATEMENT (SECOND) OF TORTS § 611; *R. Sack, supra* note 60, § IV.3.4, at 169 (the synonymous terms "public interest" or "public importance" are used interchangeably).

66. The statutory privilege does not provide the media absolute immunity for their acts. It is a

defense to (or exemption from) liability and arises only upon identifiable occasions. *See* RESTATEMENT (SECOND) OF TORTS, ch. 25, Topic 2, Title B, Introductory Note; see also, *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586, 588–89 (1963); *Phoenix Newspapers, Inc. v. Choisser*, 82 Ariz. 271, 312 P.2d 150 (1957); *Fortney v. Stephan*, 237 Mich. 603, 213 N.W. 172, 174 (1927); *Garby v. Bennett*, 166 N.Y. 392, 59 N.E. 1117 (App. 1901).

67. *See* 12 O.S.1991 § 2008(C)(20), whose pertinent terms are:

"In pleading to a preceding pleading, a party shall set forth affirmatively:
* * *
20. Any other matter of avoidance or affirmative defense."
*See also* RESTATEMENT (SECOND) OF TORTS § 580A comment e (1976).

68. *Brock, supra* note 3 at 286–287.

69. In *Brock, supra* note 3 at 290, the court notes that "promoting legal change by any form of publicity in advance of the petition's pre-circulation filing is critical to the initiative process because the promoters must be able to ventilate the issues before those who are expected to join in the effort by signing the petition."

70. "If there is a rational connection between the communication or utterance complained of as defamatory and the author's quest for a political change, the communication should be viewed as protected both as political speech and a means of

*course of lawmaking already begun is protected by the statutory privilege.*[71]

¶ 31 Shortly after CALA mailed a letter to test the waters for its tort reform campaign, the petitioners published news articles about the efforts of the initiative promoters.[72] The publications reported that a group of Tulsa and Oklahoma City businessmen was preparing two statewide initiative petitions to limit punitive awards and legal fees. The articles (a) *quote* the views of CALA officials about the effect of high punitive damages awards on the state's economy and the cost of an initiative campaign, which it planned to finance with donations collected statewide, (b) *discuss* some features of the proposed measure, (c) *give* the *opponents'* position of support for large punitive damages awards that are viewed as needed to catch the attention of industries that manufacture unsafe products, and (d) *note* that the tort reform campaign has the support of other groups. The petitioners' publications in contest, which either discuss or advocate for CALA's proposed initiative petition to change the law, clearly come within the scope of the statutory privilege.

## VI

¶ 32 **THE PLAINTIFFS' TRILOGY OF DELICTUAL TORT THEORIES OF LIABILITY**

### A.

#### ¶ 33 Defamation

¶ 34 According to the respondents' argument, the petitioners published "false, deceptive, fraudulent, and defamatory statements"

relating to the plaintiffs, their profession and to the judicial branch of government. Unlike in *Brock*,[73] we are directed here to no specific language in the articles that is alleged to be defamatory. The petitioners' publications, respondents urge, are part of a publicity campaign to malign them as trial lawyers in an attempt to "injure their power and duty to practice law and to serve their clients." In support of their assertion that the publications are at least libelous *per quod*, respondents argue that the petitioners' conspiracy has sought to defame "plaintiff trial lawyers" as a strategy-choice foundation for undermining the democratic process in an effort to limit their delegated power and duty as trial lawyers. Moreover, respondents submit that the petitioners' conduct has wrongfully interfered with their right to pursue the profession of their choice by representing clients through free-and-unimpaired access to the courts, "unfettered by the unfair and unjust restrictions sought and secured by the petitioners." On the other hand, petitioners argue that the articles are neither defamatory nor are they "of and concerning" the plaintiffs.

¶ 35 Actions for libel are statutorily defined. A publication is libelous *per se* (when the defamatory impact is apparent on its face) if it "exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation...."[74] To determine whether a publication is libelous *per se*, the writing must be measured by its natural and probable effect

---

securing a change in the government's conduct of its business." *Brock, supra* note 3 at 290.

**71.** Reports of parliamentary proceedings are privileged at common law; every fair and accurate report of any proceeding in either House of Parliament, or in any of its committees, is privileged, even though it contains matter defamatory of an individual. Odgers on LIBEL AND SLANDER 252, 269 (6th ed.). "An occasion is privileged when the person who makes the communication has a moral duty to make it to the person to whom he does make it, and the person who receives it has an interest in hearing it. Both these conditions must exist in order that the occasion may be privileged." *Pullman v. Hill &*

*Co.,* (1891) 1 Q.B. 524, 528. *See also Watt v. Longsdon,* (1929) 1 K.B. 130, 69 A.L.R. 1005 (C.A.).

**72.** For the text of The Daily Oklahoman November 17, 1994 news article and that of the Tulsa World November 16, 1994 article, see Appendices A and C.

**73.** In *Brock, supra* note 3 at 291, the respondents argued that CALA's publication (of the November 14 letter) is libelous *per se* because it falsely accuses the plaintiff trial lawyers of practising *extortion*.

**74.** 12 O.S.1991 § 1441.

upon the mind of the average lay reader [75]—i.e., if the article identifies the plaintiffs (in the minds of the lay reader) and imparts a defamatory statement.[76] Those words are deemed actionable on their face which prejudicially impugn a person's skill, knowledge, or conduct in his (or her) business.[77] A writing is actionable *per se* when the language used is susceptible of but a single meaning that is opprobrious.[78] In contrast, a publication is deemed libelous *per quod* if the words are reasonably susceptible of both a defamatory and an innocent meaning.[79] The latter form of libel requires proof by extrinsic facts to show a defamatory meaning. Whether a writing is libelous *per se* presents an issue of law for the trial court's resolution. A fact determination, if necessary to decide whether a publication is libelous *per quod*, is for the jury.[80]

¶ 36 Oklahoma jurisprudence teaches that in *group. libel actions*—where the opprobrium of publication attributable to an individual plaintiff arises solely by reason of one's membership in the group—(a) the size of the group alone is not controlling although it is a factor to be considered and (b) the intensity of suspicion cast upon the plaintiff is the true test in determining a plaintiff's right to maintain a personal action for group libel.[81]

¶ 37 Statements in CALA's November 14, 1994 letter were held in *Brock* not to target legal professionals, but rather were found plainly germane to reporting the political objectives of the CALA promoters. Their publication was designed to explain the presence of a need for the proposed legislation.[82] Similarly here, the newspapers' publications, on which the defamation claim against the petitioners appears to be rested, discuss the positions of both the tort reform supporters and those of the opponents. The editorials lend support to the CALA tort reform campaign by explaining the presence of a need for the proposed legislation. Targeted are the then-perceived legal system's tolerance for exaggerated damage claims—not the legal profession itself (nor, as respondents urge, a subclass of trial lawyers).[83] The publications' language raises no inference that lawyers' conduct is responsible for the abuse (through excessive damage claims). On the contrary, the text clearly identifies a need for legislation that would fashion a powerful governor on the then-perceived freedom

---

75. *Fawcett Publications, Inc. v. Morris*, 1962 OK 183, 377 P.2d 42, 48; *Hargrove v. Oklahoma Press Pub. Co.*, 130 Okl. 76, 265 P. 635, 636 (1928). Whether a writing is libelous depends on the scope, spirit and motive of the publication taken in its entirety. An article must be given its most natural and obvious meaning, not a strained, forced or unnatural one. *Tulsa Tribune Co. v. Kight*, 174 Okl. 359, 50 P.2d 350, 353 (1935).

76. *Hargrove, supra* note 75 at 636.

77. *McCullough v. Cities Service Co.*, 1984 OK 1, 676 P.2d 833, 834, citing *Kee v. Armstrong, Byrd & Co.*, 75 Okl. 84, 182 P. 494 syl.3 (1919); *Haynes v. Alverno Heights Hospital*, 1973 OK 122, 515 P.2d 568, 569.

78. *Robert K. Bell Enterprises, Inc. v. Tulsa County Fairgrounds Trust Authority*, 1985 OK 10, 695 P.2d 513, 517; *Gentry v. Wagoner County Publishing Company*, 1960 OK 84, 351 P.2d 718, 720; *Lindley v. Delman*, 166 Okl. 165, 26 P.2d 751, 753 (1933). In *Fite v. Oklahoma Pub. Co.*, 146 Okl. 150, 293 P. 1073, 1075 (1930), the court notes that the term *per se* means " 'by itself; simply as such; in its own nature without reference to its relations.' " In slander and libel cases, the term is applied to words which are

actionable " 'because they, of themselves, without anything more, are opprobrious.' " *Id.*, quoting *Hargrove, supra* note 75 at 636. *See also Tulsa Tribune Co., supra* note 75 at 353.

79. *Miskovsky v. Tulsa Tribune Co.*, 1983 OK 73, 678 P.2d 242, 247; *Akins v. Altus Newspapers, Inc.*, 1977 OK 179, 609 P.2d 1263, 1267, *cert. denied* 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980). If the publication is not libelous *per se*, an allegation of special damages is essential to state a cause of action. *Robert K. Bell Enterprises, supra* note 78 at 517; *Edwards v. Crane*, 1956 OK 25, 292 P.2d 1034, 1036.

80. *Robert K. Bell Enterprises, supra* note 78 at 516; *Winters v. Morgan*, 1978 OK 24, 576 P.2d 1152, 1154; *Akins, supra* note 79 at 1267. If the publication is deemed libelous *per quod*, it is for the jury to determine the *factum* of injury and damage.

81. *McCullough, supra* note 77 at 835–36; *Fawcett, supra* note 75 at 51–52.

82. *Brock, supra* note 3 at 292.

83. For the newspapers' publications in contest, see Appendices A–D.

to press for excessive punitive damages verdicts. No individual nor even a small group of individuals is identified (or isolated) as a target for odium, opprobrium, criticism or for legal action. The editorials' dramatic description of the necessity for tort reform *is pure protected political speech* that cannot be the basis of actionable defamation. Assuming a group libel action by the respondents would lie against the petitioners, the text of the news articles and that of the editorials is defamatory neither of lawyers in general nor of trial lawyers as a subclass.

¶ 38 Based on the four corners of the petition and applying the *Conley v. Gibson* [84] test, the respondents cannot advance against the petitioners a defamation claim upon which relief may be granted.

## B.

### ¶ 39 Civil Conspiracy

¶ 40 A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means.[85] Unlike its criminal counterpart, civil conspiracy itself does not create liability. In order to be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means.[86] *There can be no civil conspiracy where the act complained of and the means employed are lawful.*[87] Constitutionally protected speech that renders a defamation claim nonactionable also serves to defeat a claim of conspiracy where the means alleged-

ly employed to achieve that purpose clearly are lawful.[88]

¶ 41 The plaintiffs below urge that the newspapers entered into a conspiracy with CALA to undermine the democratic process through a campaign to publish *false* and *defamatory* information about the plaintiff trial lawyers, their profession and about the Oklahoma court system. The plaintiffs seek to vindicate the claim of conspiracy among the defendants by employing civil process. The only defamatory publications which plaintiffs attribute to the defendants-newspapers are the five articles that were published after CALA's November 14, 1994 letter had launched its tort reform campaign. The gist of the plaintiffs' complaint is that the alleged conspiracy has *damaged their reputation qua lawyers* as well as *caused tortious interference with their business relations.*

¶ 42 In *Brock* we held there was no element of unlawfulness in CALA's act of joining with others to bring about a legal change by lawful means (*via* the initiative or by petitioning the government).[89] The arguments advanced in CALA's November 14, 1994 letter about an initiative to be launched constitute a clearly protected core political speech. Just as CALA's tort reform efforts are devoid of any component of unlawfulness and hence are shielded by fundamental law, so too constitutionally protected is the newspapers' political advocacy in support of the proposed legal change. If the newspapers *"conspired"* to participate in activities and

**84.** *Supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

**85.** *Jurkowski v. Crawley*, 1981 OK 110, 637 P.2d 56, 62; *Barsh v. Mullins*, 1959 OK 2, 338 P.2d 845, 847. For other jurisdictions applying the common-law definition of civil conspiracy, see *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich.App. 300, 486 N.W.2d 351, 358 (1992); *Chemetron Corporation v. Business Funds, Inc.*, 682 F.2d 1149, 1179 (5th Cir.1982)(applying Texas law); *Kent v. Kent*, 431 So.2d 279, 281 (Fla. App.1983); *Closs v. Goose Creek Consolidated Indept. Sch. Dist.*, 874 S.W.2d 859, 871 (Tex.App. 1994). In essence, a civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff may recover for an underlying tort.

**86.** A conspiracy between two or more persons to injure another is not enough; an underlying un-

lawful act is necessary to prevail on a civil conspiracy claim. *See Stiles v. Chrysler Motors Corp.*, 89 Ohio App.3d 256, 624 N.E.2d 238, 244 (1993).

**87.** *Claiborne, supra* note 25, 458 U.S. at 928, 102 S.Ct. at 3433 (the Court held that nonviolent elements of boycott activities intended to bring about political, social and economic change are entitled to First Amendment protection); *Jurkowski, supra* note 85 at 62; *Walker v. Mills*, 182 Okl. 480, 78 P.2d 697, 700 (1938); *Shaw v. Cross*, 83 Okl. 273, 201 P. 811, 812 (1921).

**88.** *Jurkowski, supra* note 85 at 62; *Hughes v. Bizzell*, 189 Okl. 472, 117 P.2d 763, 764 (1941).

**89.** *Brock, supra* note 3 at 294–95.

aims that are constitutionally protected, their conduct lacks actionable attributes. A conspiracy to carry on an activity that is lawful and shielded by fundamental law cannot be deemed tortious.

¶ 43 Within the meaning of the *Conley v. Gibson* [90] standard no acts can be shown to prove a ground for relief from petitioners' alleged conspiracy to commit any activity other than that which is lawful and constitutionally sanctioned.

## C.

### ¶ 44 The Intentional Infliction of Emotional Distress

¶ 45 Oklahoma recognizes as an independent tort the intentional infliction of emotional distress.[91] The delict, also known as a tort of outrage, is governed by the narrow standards of Restatement (Second) of Torts § 46.[92] An action for intentional infliction of emotional distress will lie only where there is extreme and outrageous conduct coupled with severe emotional distress.[93] It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46

standards.[94] Conduct which, though unreasonable, is neither "beyond all possible bounds of decency" in the setting in which it occurred, nor is one that can be "regarded as utterly intolerable in a civilized community" falls short of having actionable quality.

¶ 46 The offensive publications in this case scenario are both *protected* and *nondefamatory.* These two characteristics, when combined, take the tendered petitioners' conduct out of that category which makes it actionable under the tort-of-outrage rubric.

¶ 47 Measured by the *Conley v. Gibson* standard, the respondents cannot advance against the petitioners a tort-of-outrage claim that would warrant relief.[95]

## VII

### ¶ 48 THE PLAINTIFFS' THEORY OF INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS

¶ 49 The respondents appear to press a common-law claim for tortious interference with advantageous business relations.[96] We need not examine in detail the

**90.** *Conley, supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

**91.** *See Eddy v. Brown,* 1986 OK 3, 715 P.2d 74, 76; *Breeden v. League Services Corp.,* 1978 OK 27, 575 P.2d 1374, 1377.

**92.** Section 46, RESTATEMENT (SECOND) OF TORTS (1977) states in pertinent part:

"46. Outrageous Conduct Causing Emotional Distress
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."
Comment d. to that section provides in part:
"... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to the average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' ..."

**93.** For a defendant to bear delictual responsibility on this theory, it must be found [by the trial court] that the defendant's conduct was so outrageous as to be "beyond all possible bounds of decency" or was to be regarded as "utterly intolerable in a civilized community." *Eddy, supra* note 91 at 76; *Breeden, supra* note 91 at 1377; *Chandler v. Denton,* 1987 OK 38, 741 P.2d 855, 867.

**94.** *Eddy, supra* note 91 at 76; *Breeden, supra* note 91 at 1377.

**95.** *Supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

**96.** Oklahoma jurisprudence teaches that one has the right to prosecute a lawful business without unlawful molestation or unjustified interference from any person, and any malicious interference with that business is an unlawful act and an actionable wrong. *Crystal Gas Co. v. Oklahoma Natural Gas. Co.,* 1974 OK 34, 529 P.2d 987, 989; *Nat'l Life & Accident Ins. Co. v. Wallace,* 162 Okl. 174, 21 P.2d 492, 494 (1933); *Stebbins v. Edwards,* 101 Okl. 188, 224 P. 714, 715–16 (1924); *Schonwald v. Ragains,* 32 Okl. 223, 122 P. 203, 208 (1912). For a discussion of the difference between interference with a prospec-

particular elements of this cause of action. If there is no component of unlawfulness in either the *objective* of the agreement or in the *means* by which the purpose or objective is to be accomplished, there can be no actionable tort of interference with advantageous relations.[97]

¶ 50 A review of plaintiffs' complaints fails to disclose any allegations of "unlawful" means used by the newspapers to interfere with the plaintiffs' prospective or present business relationships. *Any publication that falls within the state constitutional freedom of political speech cannot be viewed as an act of tortious interference with a lawyer's advantageous business relations.* Measuring this claim by the *Conley v. Gibson* test,[98] we conclude from the four corners of the second amended petition (viewed in conjunction with the physical attachments to the first amended petition) that the respondents cannot advance a claim for delictual interference with their advantageous relations which would entitle them to relief against the petitioners on this theory of liability.

¶ 51 Today's holding that the plaintiffs have failed to state against the petitioners a claim upon which relief may be afforded has its basis in the political speech protections

afforded by the various clauses of the Oklahoma Constitution. U.S. Supreme Court jurisprudence need not be invoked as dispositive in passing upon rights guaranteed by state constitutional provisions. The Oklahoma Constitution affords *bona fide* separate, adequate, and independent grounds upon which today's opinion is rested.[99]

## VII

## SUMMARY

 ¶ 52 Prohibition will lie to arrest pending proceedings when the remedy of appeal is manifestly inadequate to protect against the chilling effect of a civil action on fundamental political freedom, and the litigation to be arrested by prohibition lacks actionable quality. The state constitutional shield surrounding the freedom of political speech *protects these petitioners from the burden of defending themselves in court for the conduct that forms the basis of the action that the plaintiffs seek to prosecute.*

¶ 53 Based on the four corners of the second amended petition (with recognized materials) and applying the *Conley v. Gib-*

97. There is no actionable claim if the *interference is lawful* or *does not encompass any unfair or unlawful act. See, e.g., Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1987) (intentional interference with a

tive economic advantage and with contractual or business relations, see *Overbeck v. Quaker Life Ins. Co.,* 1984 OK CIV APP 44, 757 P.2d 846, 847–48. *See in this connection Lakeshore Community Hosp., Inc. v. Perry,* 212 Mich.App. 396, 538 N.W.2d 24, 27 (1995); *Weitting v. McFeeters,* 104 Mich.App. 188, 304 N.W.2d 525, 529 (1981); *Wilkerson v. Carlo,* 101 Mich.App. 629, 300 N.W.2d 658, 659 (1980), for the elements of tortious interference with advantageous business relationships or prospective economic relations. The RESTATEMENT (SECOND) OF TORTS § 766B states that "[o]ne who *intentionally* and *improperly interferes with another's prospective contractual relation* (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." (Emphasis supplied.)

precontractual business relationship is actionable if effected by unlawful means or, under the theory of prima facie tort, by lawful means without justification); *Quail Ridge Assocs. v. Chemical Bank,* 162 A.D.2d 917, 919–20, 558 N.Y.S.2d 655, 658, appeal dismissed, 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (N.Y.App.1990); *accord BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan,* 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996) (Michigan law) (requiring unlawful means); *see also Bonelli v. Volkswagen of America, Inc.,* 166 Mich.App. 483, 421 N.W.2d 213, 219–220 (1988) (requiring unlawful means).

98. *Supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

99. *Michigan, supra* note 50, 463 U.S. at 1041, 103 S.Ct. at 3476. In our declarations of state constitutional law, cited federal jurisprudence, we repeat, is used solely for guidance where there is a lack of state case law. For Oklahoma cases applying the *Michigan v. Long* rule, see *Matter of Adoption of J.R.M.,* 1995 OK 79, 899 P.2d 1155, 1160–61; *Messenger v. Messenger,* 1992 OK 27, 827 P.2d 865, 872; *Reynolds v. Porter,* 1988 OK 88, 760 P.2d 816, 818.

*son*[100] test, the respondents cannot advance, under any legal theory, the claim pressed below against these petitioners.

¶ 54 ORIGINAL COGNIZANCE TAKEN; WRITS GRANTED.

¶ 55 SUMMERS, V.C.J., HODGES, LAVENDER and OPALA, JJ., and STRUBHAR, S.J. (sitting by designation in lieu of KAUGER, C.J., who certified her recusal), concur;

¶ 56 ALMA WILSON, J., concurs in part and dissents in part;

¶ 57 SIMMS, HARGRAVE and WATT, JJ., dissent.

¶ 58 APPENDIX A

The Daily Oklahoman November 17, 1994 News Article

¶ 59 . "BUSINESSMEN PLAN PETITION SEEKING TORT REFORM

¶ 60 By Mick Hinton

Capitol Bureau

¶ 61 Frustrated by what they consider frivolous lawsuits and exorbitant attorney fees, some leading Oklahoma businessmen are planning a statewide initiative petition drive early next year.

¶ 62 Oklahoma City banker David Rainbolt said Wednesday the petitions will call for tort reform, which would be a boon to economic development.

¶ 63 "Businesses look for states where the cost of doing business can held keep them competitive," said Rainbolt, chief executive officer of BancFirst.

¶ 64 "In terms of a runaway civil justice system, Texas, is one of the worst in the nation. It would give us a heck of a recruiting tool," he said.

¶ 65 But Emmanuel Edem, president of the Oklahoma Trial Lawyers Association, said Wednesday, "We will agree to limit attorneys fees when they limit the cost of money that their banks can charge the consumer."

¶ 66 "It is un-American to single out a profession and by legislative action to list the fees that a person can charge."

¶ 67 One of the petitions is intended to assure that in cases with very large settlements, that punitive damages will never exceed actual damages.

¶ 68 Rainbolt said in a Tulsa case several years ago, a hospital was assessed punitive damages 50 times the amount of actual damages.

¶ 69 He said the hospital, customers and public have to make up the difference because punitive damages are uninsurable.

¶ 70 Edem responded that such an award is necessary to get the hospital's attention. He said the case in point involved a patient recovering from surgery who mistakenly was subjected to a second operation.

¶ 71 Rainbolt said the businessmen are resorting to circulating petitions because they have been repeatedly unsuccessful when they tried to get a bill before either House of the Legislature.

¶ 72 One of the proposed petitions says that a judge, rather than a jury, would set punitive awards. It also would limit the amount of punitive damages.

¶ 73 Punitive damages would not be awarded unless the jury is persuaded by clear and convincing evidence that the defendant either acted with gross negligence or acted intentionally with malice toward the plaintiff.

¶ 74 The second petition would set a sliding scale for the amounts attorneys could charge.

¶ 75 Their contingency fees would be limited to 33 percent of the amount awarded up to the first $100,000; to 20 percent of the next $900,000, and 10 percent of any award more than $1 million."

¶ 76 APPENDIX B

The Daily Oklahoman November 28, 1994 Editorial

¶ 77 "FOR TORT REFORM

---

**100.** *Supra* note 2, 355 U.S. at 45–46, 78 S.Ct. at 102.

¶ 78 The multi-million-dollar damage lawsuit award to the California woman who spilled a cup of McDonald's coffee in her lap while driving her car underscores the dire need for major tort reform in the nation.

¶ 79 The Republican "Contract With America" includes a promise to push for legislation to restrain frivolous damage lawsuits and reasonable limits on punitive awards to plaintiffs.

¶ 80 The mindset of many citizens who serve on juries—molded like clay in the hands of sometimes greedy and unscrupulous lawyers—is that such outlandish awards cost only the insurance companies or large corporations with deep pockets.

¶ 81 The consuming public gets it in the neck, as real people pick up the tab. Large punitive awards—as opposed to reasonable compensation for demonstrated injury—drive up the prices of products and contribute to skyrocketing medical costs.

¶ 82 That damage-suit mania or runaway litigation is the target of a group of Oklahoma businessmen which has formed an organization to conduct an initiative petition drive for tort reform. Its strategy calls for circulation of two petitions aimed at limiting punitive damage awards and setting a sliding scale limiting contingency legal fees in civil cases to a maximum of 33 percent of an award. (Lawyers sometimes get up to 50 percent of awards made to clients.)

¶ 83 The businessmen are on the right track. Meaningful tort reform has always had as much chance in the Oklahoma Legislature as the snowball in you know where. That's because of the major influence wielded in the Legislature by trial lawyers who vigorously oppose such changes. Still you'd think the trial lawyers and their pals would get a clue: Both Frank Keating (47 percent of the gubernatorial vote) and Wes Watkins (23 percent) campaigned as tort reformers.

¶ 84 A popular vote holds the promise of successful, long overdue reforms. It should help also that tort reform is included in the agenda Gov.—elect Keating said he will push during his administration."

¶ 85 APPENDIX C

Tulsa World November 16, 1994 News Article

¶ 86 "LAWSUIT LIMIT BID IN WORKS

Petition effort under way to ask Sooner voters to limit lawsuit awards and lawyer fees.

¶ 87 By Brian Ford

World Capitol Bureau

¶ 88 Oklahoma City—Saying the state is paying too high a price for frivolous lawsuits, a group of Tulsa and Oklahoma City businessmen are preparing statewide initiative petitions to limit punitive awards and lawyer fees.

¶ 89 Oklahomans Against Frivolous Lawsuits, a new organization, is preparing two initiative petitions to be circulated early next year, said John A. Brock, the president of the group. Brock, who runs Rockford Exploration Inc. in Tulsa, said he would like to see the proposed state questions put to voters at the November 1996 general election.

¶ 90 George Kaiser, chairman of Bank of Oklahoma and president of Kaiser–Francis Oil Corp., and David Rainbolt, head of Banc First in Oklahoma City, are also involved in the upcoming petition drive, Brock said.

¶ 91 Brock said high punitive damage awards in civil cases and lawyer fees have become a drag on the state's economy.

¶ 92 Brock said he, Kaiser, Rainbolt and others are "concerned with runaway litigation in this state." For example, liability costs boosts the price of football helmets twice what they would normally cost, he said. Immunity shots cost three times as much as they should, thanks to liability costs, he said, and a doctor may have to pay up to $100 a day for malpractice insurance.

¶ 93 Certain airplane manufacturers no longer make small aircraft because they can no longer afford high liability costs, Brock said.

¶ 94 One of the group's initiative proposals would prohibit court awards with punitive damages unless the jury has "clear and convincing evidence" that the defendant dis-

played gross negligence or reckless disregard to the plaintiff; or the defendant acted intentionally with malice toward the plaintiff.

¶ 95 The judge would determine the amount of the punitive award rather than the jury, Brock said.

¶ 96 If a jury found that a defendant acted with gross negligence or reckless disregard, the award could not exceed actual damages or $250,000, whichever is more.

¶ 97 If a jury found that the defendant acted with malace, [sic] the award could be as high as twice the actual damage or $500,000, whichever is more.

¶ 98 The second initiative would limit contingency fees earned by lawyers in civil cases. Contingency fees are usually based on the amount of an award the plaintiff receives.

¶ 99 Under the proposal, contingency fees could not exceed 33 percent of the first $100,000 in punitive awards; 20 percent of the next $900,000; and 10 percent of any award more than $1 million. Brock claimed attorneys now receive up to half of punitive awards.

¶ 100 Proponents of large punitive awards say they are needed to catch the attention of large industries that manufacturer [sic] faulty or unsafe products or put out unsafe services.

¶ 101 Brock agreed that punitive damages should punish wrongdoers, but believes there are two [sic] many cases where punitive awards are too high.

¶ 102 "The fundamental reason we are doing this is to help the state's economic situation," he said. "The state of Texas has just gone crazy (with lawsuits) and people are flocking out of California to get away from this sort of thing. This is one of the principal causes for the reduction of the standard of living in this country."

¶ 103 Brock said attempts have been made to reduce punitive awards through state legislation, but such attempts have repeatedly been blocked. He said too many state lawmakers are "owned" by trial attorneys.

. ¶ 104 The State Chamber of Commerce and Industry has indicated it will support the initiative petitions as they are presently proposed.

¶ 105 Gov.—elect Frank Keating has also said he supports making punitive damages more difficult to get.

¶ 106 Under state law, the petitioners will have 90 days from the start of their drives to get the required number of signatures.

¶ 107 If the petitioners seek a change in state law, they will require 79,601 valid signatures, which is 8 percent of the highest number of votes cast in last Tuesday's general election. If the petitioners seek a change in the state Constitution, they will need 149,-552 valid signatures, 15 percent of the votes cast in the last general election.

¶ 108 Brock estimated that the initiative effort, combined with the campaign to convince people to vote for the proposed state questions, could cost as much as $3 million. He said his organization would seek donations from businesses across the state to fund the effort."

¶ 109 APPENDIX D

Tulsa World November 17, 1994 and February 13, 1995 Editorials

¶ 110 A. November 17, 1994

¶ 111 "FINALLY, TORT REFORM
One of the desirable codicils contained in the Republicans "Contract With America" is the promise to push for federal legislation to limit frivolous damage lawsuits and to put reasonable limits on punitive damage awards to plaintiffs in such suits.

¶ 112 Damage-suit mania has taken a terrible toll on American business and has not exactly been a blessing for consumers, either. Huge punitive awards, as opposed to legitimate compensation for demonstrated injury, have driven up the prices of products from ladders to football helmets, contributed to the skyrocketing cost of medical service and, in the case of small aircraft, nearly driven American manufacturers out of an entire business.

¶ 113 Now, in addition to the national movement, it appears there is a good

chance in Oklahoma to restrain runaway litigation.

¶ 114 A group of prominent Tulsa and Oklahoma City businessmen has formed an organization to conduct an initiative petition drive for tort reform. The group hopes to circulate two petitions early next year and to have the proposals on the 1996 general election ballot. One would limit punitive damage awards and the other would limit lawyers' contingency fees in civil cases. Damage-suit lawyers sometimes get up to 50 percent of awards made to their clients.

¶ 115 These common-sense proposals are long overdue. The trial lawyer-dominated Legislature has been unable to act on them. Taking them to the people in the form of initiative petitions is the best, and probably only, way to get them accomplished."

¶ 116 B. February 13, 1995.

¶ 117 "BULL'S–EYES FOR KEATING

¶ 118 Some of the best ideas in Gov. Frank Keating's program have been overshadowed by his controversial, education-bashing budget.

¶ 119 And that's a shame because, when you get past his budget, this new governor has some proposals that could go a long way toward boosting Oklahoma's economy without costing taxpayers a dime.

¶ 120 Idea No. 1 is tort reform, i.e., changes to bring some fairness to the way claims for damages are handled in this state. Any state that could offer some reasonable relief from frivolous, shakedown lawsuits and capricious punitive damage awards would have a terrific selling point for new industry.

¶ 121 The same can be said for the governor's general plans to improve the workers compensation system. He made a start by promising to appoint industrial court judges who have not been regular members of the workers comp bar. This isn't to say that workers-comp attorneys are bad. Most of them are honest, hard-working attorneys who are quite good at what they do. It is the system that is at fault, and the system could best be improved by judges who have not been a part of it. The problem cries out for fresh thinking, unfettered by the voice that says: We cannot change because we have always done it this way.

¶ 122 Keating also is on target with his plan to settle the right-to-work issue in Oklahoma. He says he will push for a right-to-work law in the Legislature and, failing that, will support an initiative petition.

¶ 123 You wonder why no one thought of this before. With luck, Oklahoma will wind up with a right-to-work law, which will make the state more competitive in recruiting industries that consider the law important. But even if the push for right to work should be defeated in a popular vote, it will get this acrimonious issue out of the limelight. The repetitious, rancorous argument over right to work creates an impression that Oklahoma has some kind of serious labor problem, which it does not."

¶ 124 APPENDIX E

The November 14, 1994 CALA Letter

¶ 125 "November 14, 1994

Gentlemen:

¶ 126 *Frivolous lawsuits result in unnecessary litigation costs or the extortion of unjustified settlements.* The impact on the standard of living and quality of life of Oklahoma citizens is enormous. Economic growth is stunted by increased costs of doing business and suppressed innovation, restricting job opportunities and wages. Our local governments and school systems have been robbed of precious resources that should be allocated to building infrastructure and educating our children. Directly and indirectly all productive people suffer from the abuse of our civil justice system.

¶ 127 For years concerned citizens and associations have made a concerted effort to address these problems through legislation. The results have been dismal. The Trial Lawyers Association has typically prevented tort reform bills from even being heard in committee: hardly democracy at work. A

near majority of members of Oklahoma's State Senate are themselves attorneys. Years of such oppression as well as recent discussions with legislative and civil leaders make it clear there will be no relief from the state legislature.

¶ 128 Citizens Against Lawsuit Abuse is being organized to change our Constitution in a manner which will materially reduce the number of frivolous lawsuits and make our courts more equitable. Our goal ... pass the two initiative petitions summarized below. The result ... heightened productivity and product development through a reduction in the legal bureaucracy. The business development climate in Oklahoma will be enhanced (especially relative to Texas, our notoriously litigious neighbor) and more job opportunities will result.

¶ 129 Citizens Against Lawsuit Abuse has selected these two initiatives because we believe they are: 1) understood by the general public; 2) popular amongst survey respondents; and 3) a broad impact. *Initiative number one is designed to give innocent defendants greater access to the courts by reducing the extortionistic value of large punitive damage requests which are unrelated to the alleged actual damages.* The second creates a minimum quality of lawsuit that makes economic sense to be filed by limiting the fees an attorney can charge on a contingency basis.

¶ 130 Initiative Petition No. 1—Punitive Damages (summary only)

¶ 131 Limitation on Recovery of Punitive Damages. Punitive damages will not be awarded unless the jury is persuaded by clear and convincing evidence that the defendant: (*l*) acted with gross negligence or reckless disregard for the rights of the plaintiff, or (2) acted intentionally with malice toward the plaintiff.

¶ 132 The judge will determine the amount of the punitive damages. If the defendant acted with gross negligence or reckless disregard for the plaintiff, but not intentionally and maliciously, the judge may award punitive damages in an amount not to exceed the actual damages suffered by the plaintiff or $250,000, whichever is

more. If the defendant acted intentionally with malice toward the plaintiff, the judge may award punitive damages in an amount not to exceed twice the actual damages or $500,000, whichever is more.

¶ 133 Initiative Petition No. 2—Contingent Fees—Limitation on Amount (summary only)

¶ 134 It shall be unlawful for contingent attorneys fees of a client's cause of action to exceed:

(A) 33% of the first $100,000.

(B) 20% of the next $900,000. and

(C) 10% of any sum over $1,000,000

of the net amount (after direct costs) of any judgment as may be recovered or any compromise or settlement as may be made.

¶ 135 Our statewide polling indicates that 77% of the voters would vote for a cap on punitive damages (with 6% undecided) and 88% would vote for a cap on attorneys contingent fees (with [unintelligible] % undecided). These are the most popular of the seven issues considered.

¶ 136 We want your organization to join the effort by becoming a member of our steering committee. As you know, challenging the trial lawyers and taking our message to the people will be an expensive process. As you can see in the attached budget draft, we estimate it will cost approximately $600,-000 to secure incontrovertible petitions, complete the legal drafting and defend the challenges that are certain to come. Thereafter, a media campaign could cost an additional $1.5 to $2.5 million. Consequently, we will eventually plan on soliciting your membership for financial assistance once our 501–C–4 is formed.

¶ 137 Attached is a very general time frame we wish to pursue. Obviously, decisions on the final language of the initiatives, promotional material, media content and infinite other strategic details will be taken up by the steering committee and the respective experts they hire. However, we need a "leap of faith" to some extent at this point in time as we form the nucleus of our group. Oklahoma needs to be responsive to its citizens,

not to lawyers. The time for change is now!" (Emphasis supplied.)

SIMMS, Justice, dissenting.

¶ 1 I must respectfully dissent to the use of this Court's Prerogative writ power to halt proceedings in the trial court, which has jurisdiction over the parties and the subject matter of the lawsuit. The writ is issued solely on the basis of the allegations contained in the trial court pleadings, particularly an amended petition. I would assume jurisdiction in this matter, however, solely to address the venue issue of whether or not Oklahoma should adopt the "single publication rule". With the advent of mass publication and wide spread distribution of published materials, we should re-examine Oklahoma's "multiple publication rule", which would permit the action in this case to be filed in numerous counties of the state. Has the "multiple publication rule" become archaic? If so, then a prerogative writ might properly issue.

WATT, Justice, with whom HARGRAVE, Justice, joins, dissenting:

Consistent with my dissenting vote in the companion case, *Brock v. Thompson*, 1997 OK 127, 948 P.2d 279, I dissent to this Court's assumption of original jurisdiction and pronouncement today based upon the record before us.

I would have declined to assume original jurisdiction; allowed a complete record to be developed below, and if a subsequent appeal taken, then resolve the issues tendered at this time.